Robert L. DOWELL, etc., et al.,
Plaintiffs,

v.

BOARD OF EDUCATION OF the OKLAHOMA CITY PUBLIC SCHOOLS et al., Defendants.

Civ. No. 9452.

United States District Court,
W. D. Oklahoma.

Feb. 1, 1972.

John W. Walker, Little Rock, Ark., for plaintiffs.

J. Harry Johnson, Oklahoma City, Okl., for defendant.

## MEMORANDUM AND ORDER

BOHANON, Chief Judge.

This is another step in the struggle to implement the constitutional imperative for a unitary school system in the Oklahoma City School District. This case has been before this court in one posture or another for about ten years. Although unnecessary to detail every facet of the complex history of this litigation, every action of this court has been predicated upon the finding that as historically administered, the policies of the Defendant School Board have reflected a system of state imposed and state preserved segregation, and that because it had operated a state compelled dual system, the Defendant School Board was "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).[1]

On August 30, 1971, the Court of Appeals directed this court to hold hearings for the purpose of determining the effectiveness of the plans heretofore ap-

1. For prior decisions in this case, see Robert L. Dowell et al. v. School Board of the Oklahoma City Public Schools, 219 F.Supp. 427 (1963) ; Robert L. Dowell et al. v. School Board of Oklahoma City Public Schools, 244 F.Supp. 971 (1965) ; Robert L. Dowell v. Board of Education of the Oklahoma City Public Schools, 307 F.Supp. 583 (1970).

It should also be noted, perhaps, that on August 21, 1970, this court entered an order, on its own motion, closing this case. The Plaintiffs immediately protested and subsequently on May 3, 1971, this court vacated its earlier order. In making the August 1970 order, the court considered it desirable to have a cooling period to see how the plan it had approved would work and to await further clarification of desegregation guidelines by the Supreme Court anticipated from the observation of the Chief Justice in Northcross v. Board of Education of Memphis, Tennessee, City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), that there were still practical problems to be determined. In addition, it had been suggested to the court that HEW wished to participate in further desegregation proceedings but would not intervene in a private suit. In short, the court thought it was taking the proper action and the schools were permitted to operate during the 1970–1971 school year without the stress of litigation and the Supreme Court did on April 20, 1971, hand down its important decision in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. It is clear, however, that this court was required to retain jurisdiction to evaluate the plan in practice and to see that state imposed segregation was completely removed. Green v. County School Board of New Kent County, supra. In Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968), the Supreme Court in a similar situation declared:

"Dismissal will ordinarily be inconsistent with the responsibility imposed on the district courts by Brown II. 349 U.S., at 299–301 [75 S.Ct. 753]. In light of the complexities inhering in the disestablishment of state-established segregated school systems, Brown II contemplated that the better course would be to retain jurisdiction until it is clear that disestablishment has been achived. We agree with the observation of another panel of judges of the Court of Appeals for the Eighth Cir-

proved for the junior and senior high-schools of Oklahoma City and to evaluate the expected effectiveness of the plan for the elementary schools, and then to put into effect forthwith whatever modification of either or both plans thereupon found necessary, or additional plans, to accomplish the desegregation of the Oklahoma City Public Schools in accordance with the guidelines set forth by the Supreme Court. Pursuant to this directive, hearings on these matters were conducted by the court on September 21, November 18, 19, and December 9, 1971. Appearing therein for the Plaintiffs was Mr. John W. Walker, Attorney at Law, Little Rock, Arkansas. The individual members of the Defendant School Board were present in person and with the Board's attorney, Mr. J. Harry Johnson, Oklahoma City, Oklahoma.

Three plans are presently before the court for consideration. First there is the current plan in operation in the Oklahoma City Public Schools. The School Board stoutly maintains this is adequate to meet constitutional requirements and has refused to present any other plan for the further desegregation of the Oklahoma City Public School System. It did suggest to the court the name of Dr. Harold H. Eibling, Superintendent of Schools, Columbus, Ohio, as being a person who is an expert in the field of education and in the field of school administration and one who is competent and qualified to evaluate, analyze, and propose a full and complete plan for the desegregation of the Oklahoma City

School District. Following the recommendation of the Board, the court, on June 16, 1971, appointed Dr. Eibling to make a careful study in depth of the current plan adopted by the Oklahoma City School Board and to make a report and recommendation concerning the current plan and any modifications which might be necessary to meet constitutional requirements. Later Dr. Eibling requested that Dr. Forrest E. Conner of Washington, D. C., another expert recommended by the Defendant School Board, be appointed to assist him in his task. The "Consultants' Plan," together with the objections of the Defendant School Board was filed with the court on November 9, 1971. The Plaintiffs have submitted a plan prepared by Dr. John A. Finger, Providence, Rhode Island, a professor of education at Rhode Island State University and an expert in the field of desegregation and integration.

## I

## CURRENT PLAN

The Public School System operated by the Defendant School Board is comprised of 86 regular elementary schools (K–6), one middle school (6–8), twelve junior highschools (7–9), eight senior high-schools (10–12), Dunjee for grades 7–12, Star-Spencer for grades 9–12, and five special schools.[2] On September 10, 1971, the total enrollment was 68,840: 76.6 per cent of these students were white and 23.4 per cent black. There

---

cuit in another case that the district courts 'should retain jurisdiction in school segregation cases to insure (1) that a constitutionally acceptable plan is adopted, and (2) that it is operated in a constitutionally permissible fashion so that the goal of a desegregated, non-racially operated school system is rapidly and finally achieved.' Kelley v. Altheimer, 378 F.2d 483, 489. See also Kemp v. Beasley, 389 F.2d 178."
Indeed, the Court of Appeals has already judicially found that this court should retain jurisdiction in this case until all unconstitutional practices in the system are

eliminated. Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158, 168 (CA 10 1967).

2. These are fully integrated special education facilities which need not be involved in any further plan for. desegregation :
   1. Orchard Park (2–6)—Elementary school for handicapped children
   2. Carver (7–12)—Secondary school for handicapped children
   3. Adult Day (9–12) For pregnant and married girls
   4. Washington (8–12)—For children who are disciplinary problems
   5. Area Vocational-Technical Center

are 31 schools attended entirely by students of one race.  78 per cent of the public schools are at least 90 per cent predominantly white or black.[3]

3.  Schools at least 90 per cent predominantly white or Negro.

## A.  ELEMENTARY SCHOOLS

### K–6

| Schools of 10% or less black | % white | 5% or less black | Schools of 10% or less white | % black | 5% or less white |
|---|---|---|---|---|---|
| Adams | 100.0 | x | Creston Hills | 100.0 | x |
| Arthur | 100.0 | x | Culbertson | 100.0 | x |
| Bodine | 98.8 | x | Dewey | 99.2 | x |
| Britton | 99.5 | x | Dunbar | 98.3 | x |
| Buchanan | 99.6 | x | Edison | 100.0 | x |
| Burbank | 97.8 | x | Edwards | 99.7 | x |
| Cleveland | 92.7 | | Garden Oaks | 100.0 | x |
| Coolidge | 100.0 | x | Green Pastures | 98.6 | x |
| Davis | 100.0 | x | Harmony | 99.7 | x |
| Emerson | 91.1 | | Lincoln | 99.1 | x |
| Eugene Field | 99.7 | x | Longfellow | 99.3 | x |
| Fillmore | 100.0 | x | Page | 100.0 | x |
| Garfield | 99.3 | x | Parker | 99.7 | x |
| Gatewood | 96.4 | x | Polk | 97.8 | x |
| Harrison | 100.0 | x | Truman | 100.0 | x |
| Hawthorne | 100.0 | x | Woodson | 100.0 | x |
| Hays | 99.5 | x | | | |
| Henry | 100.0 | x | **TOTAL** | **16 SCHOOLS** | **16 SCHOOLS** |
| Heronville | 100.0 | x | | | |
| Hillcrest | 100.0 | x | | | |
| Johnson | 90.9 | | | | |
| Kaiser | 99.5 | x | | | |
| Lafayette | 100.0 | x | | | |
| Lee | 99.0 | x | | | |
| Linwood | 100.0 | x | | | |
| Lone Star | 100.0 | x | | | |
| Madison | 99.0 | x | | | |
| Mayfair | 91.5 | | | | |
| McKinley | 100.0 | x | | | |
| Monroe | 99.5 | x | | | |
| Oakridge | 99.8 | x | | | |
| Parmelee | 100.0 | x | | | |
| Pierce | 100.0 | x | | | |
| Prairie Queen | 100.0 | x | | | |
| Quail Creek | 99.5 | x | | | |
| Rancho | 97.2 | x | | | |
| Ridgeview | 99.6 | x | | | |
| Rockwood | 93.4 | | | | |
| Shields Heights | 100.0 | x | | | |
| Southern Hills | 99.8 | x | | | |
| Stonegate | 100.0 | x | | | |
| Star | 91.8 | | | | |
| Telstar | 98.2 | x | | | |
| Tyler | 92.6 | | | | |
| Valley Brook | 100.0 | x | | | |
| Van Buren | 100.0 | x | | | |
| W. Nichols Hills | 99.8 | x | | | |
| Western Village | 99.8 | x | | | |
| Westwood | 96.3 | x | | | |
| Wheeler | 94.6 | | | | |
| Willard | 94.9 | | | | |
| Willow Brook | 97.2 | | | | |
| Wilson | 93.4 | | | | |
| **TOTAL** | **53 SCHOOLS** | **43 SCHOOLS** | | | |

TOTAL ELEMENTARY SCHOOLS _____ 86
Schools where racial composition is 10% or less black or white ____ 69
Schools where racial composition is 5% or less black or white _____ 59

## A. HIGHSCHOOLS.

The highschools are being operated under what is generally described as the Cluster Plan. The highschools have been divided into two clusters. Cluster A includes Capitol Hill, Douglass, Grant, and Southeast Highschools; Cluster B includes Classen, Marshall, Northeast and Northwest Highschools. Dunjee and Star-Spencer Highschools, while nominally attached to Cluster B, because of their remote location serve only as homesite schools. Each cluster contains one highschool with a majority black enrollment. This court approved a "COMPREHENSIVE PLAN FOR COMPLETE DESEGREGATION OF SENIOR AND JUNIOR HIGHSCHOOLS OF THE OKLAHOMA CITY PUBLIC SCHOOL SYSTEM AFTER 1969–1970

### B. JUNIOR HIGHSCHOOLS

7–9

| Schools of 10% or less black | % white | 5% or less black | Schools of 10% or less white | % black | 5% or less white |
|---|---|---|---|---|---|
| Capitol Hill Jr | 92.1 | | Kennedy | 100.0 | x |
| Central | 93.5 | | Moon | 99.2 | x |
| Hoover | 97.3 | x | | | |
| Jackson | 91.0 | | TOTAL | 2 SCHOOLS | 2 SCHOOLS |
| Jefferson | 100.0 | x | | | |
| Roosevelt | 100.0 | x | | | |
| Taft | 90.5 | | | | |
| Webster | 99.7 | x | | | |
| TOTAL | 8 SCHOOLS | 4 SCHOOLS | | | |

TOTAL JUNIOR HIGHSCHOOLS _____ 12
Schools where racial composition is 10% or less black or white ____ 10
Schools where racial composition is 5% or less black or white _____ 6

### C. HIGHSCHOOLS

10–12

| Schools of 10% or less black | % white | 5% or less black | Schools of 10% or less white | % black | 5% or less white |
|---|---|---|---|---|---|
| Southeast | 98.0 | x | Douglass | 100.0 | x |
| Capitol Hill Sr | 97.4 | x | | | |
| Grant | 99.0 | x | TOTAL | 1 SCHOOL | 1 SCHOOL |
| Marshall | 97.0 | x | | | |
| TOTAL | 4 SCHOOLS | 4 SCHOOLS | | | |

TOTAL HIGHSCHOOLS (10–12) _____ 8
Schools where racial composition is 10% or less black or white ____ 5
Schools where racial composition is 5% or less black or white _____ 5

### D. OTHER

Dunjee (7–12)    98.2% black

### E. SUMMARY

TOTAL SCHOOLS IN SYSTEM EXCEPT SPECIAL SCHOOLS _____ 109
Schools at least 90% predominantly white or Negro _____ 85
Percentage of total _____ 78%

SCHOOL YEAR" on January 16, 1970, which was affirmed by the Court of Appeals which, however, noted:

"It is of course apparent that the real and ultimate issue in any case such as this is the actual effectiveness of the plan proposed. This is difficult to predict in this instance since the Plan here presented is a virtually untried method and one departing widely from customary school attendance and scheduling practices." Dowell v. Board of Education of Oklahoma City Public Schools, 430 F.2d 865, 868 (CA 10 1970).

The current plan is not the plan approved by this court. The plan submitted provided:

"Under this plan, each secondary school will serve in a dual capacity. It will be a home-base school for students within its attendance area and will serve as a specialized center for a specified curricular area. For example, one school could serve as a *Social Studies Center*, another as a Science Center, another as a Math Center. Each school, in its role as home-base, will offer some elective courses and such activities as physical education, athletics, and music to its resident students; in its role as a specialized Center, it will offer *a full range* of courses in that curriculum area to students from several attendance areas, including its own.

. . . . . .

". . . Within each cluster, individual schools will serve as home-base schools for students in their own attendance areas and as specialized schools for students from all schools within that cluster.

. . . . . .

"*Students will spend varying amounts of time each week in each of the Centers, though not less than half the school day at any one Center.*" [Emphasis supplied.]

As conceived by the court from the language of the plan and the testimony in support,[4] the school acting as a special-

4. Transcript of Proceedings, December 15, 16, 1969, hearing, pp. 130, 171, 190, 191:

p. 130: "A [Dr. Lillard] I think one thing we need to point out. We sometimes use the term 'requireds' and 'electives.' There are certain minimum requireds to graduate from an Okla-City high school as approved by North Central, but after they get the minimum requireds out of the way, then if a student is majority or concentrating in science or social studies, or math, then all of those additional subjects, not just the one year of high school science that is required for graduation, if 'X' School is designated where science will be taught, then those students who are taking their required science will take that year but also those students who are majoring in science, taking chemistry and physics and science seminar, would be returned to that school to take their advance science courses.

. . . . .

p. 171: "Q. [Mr. Walker] I see. So that every student in the city will be transported under your Cluster Plan at some time at least once in his—every year?

"A. [Dr. Lillard] On the senior high level?

"Q. [Mr. Walker] Yes.

"A. [Dr. Lillard] Yes, sir.

. . . . .

p. 190: "A [Dr. Lillard] I think the strength of this plan is that you have what would be a better quality instructional program in the process of desegregating the schools. Typically we have only moved pupils to take the same subjects at a different school, and I think this has been one of the complaints of the patrons. They had much rather, if they are going to take the same history, the same English, stay in the local community, but if you can have a concentration of the outstanding teachers for the high schools in one location, we think you will have a better quality instructional program. The boys and girls will be taking whatever this subject might be and I think the other point is that we tend to think of a subject, Mr. Walker, only in terms of the required subject. For example, if we say a certain high school will be a Science Center, then students will have to take their required biology there. Well, that's only for students who are taking the one year in the required science. Those who are majoring in the science, taking chemistry and phys-

ized center would offer *all* courses including the required courses in the subject area of specialization. No student could avoid attending the other schools within his cluster.

Although specifically directed by the court to carry out the terms of such plan as approved, the Defendant School Board, without notice to or permission by the court, proceeded to emasculate the plan. It eliminated social studies as a specialized area of one of the highschools of each cluster, although this subject had been included in the original plan submitted to the court. It did not concentrate a subject area specialization in only one senior highschool. At the present time in Cluster A, there are three highschools with advanced foreign language courses and three highschools offer-

ing advanced mathematics courses. In Cluster B, the same situation exists. This change obviously negated many of the advantages of specialization set forth in the plan which was submitted to the court with regard to concentration of material, staff, and supervision. Each home-base school was permitted to offer all of the required courses in the four areas of subject specialization.

These unauthorized basic changes in the implementation of the plan destroyed it as a tool of desegregation. The vast majority of the students in the senior highschools do not participate in the Cluster Plan. By electing certain subjects a student can spend his full three years in his home-base school, thereby thwarting any effective desegregation. Out of a total of 13,796 students enrolled

ics, advanced biology, botany, physiology, science seminar, all of those electives, will be integrated within that school or in that center. So I think sometimes we fall into the trap of just saying only the required subjects will be, but every required subject has a variety of electives within that school, within that subject matter field.

"Q. [Mr. Walker] Now you say that the students will go from school to school under your Cluster Plan. Isn't it possible for the students to exercise their own freedom of choice, so to speak, of classes?

"A. Not to the best of my knowledge other than the selection of electives.

"Q. Now my question is this. Isn't it possible that say a given student who does not want to go to Douglass can defer taking whatever is offered that is required for him at Douglass until say either the summer or that he can take that course outside the system and then get credit for it within the system?

"A. We would want to probably structure our summer school program so that they would reflect the local units as they do now.

"Q. Just answer my question, as I stated it. Isn't it possible for a student by his exercise of the freedom of choice of classes, the times that he will take those classes, that he can stay away from Douglass School?

A. I don't think so. Possibly there is some way they could select a subject, but part of our problem now, and it is a problem, is to get students to move four

or five miles to take a subject—then I think even fewer would go ten, twelve, fifteen or twenty miles to take a subject.

"Q. All right. My question is this, if a student say at Grant has a social science required course to take and it's to be offered the first semester of 1970–'71 and offered at Douglass Center, can he not be filling out his own schedule defer taking that social science course until the summer? Just answer that question.

"A. Yes, he could.

"Q. Now isn't it possible then for him, if there is a private school in the city, to go to that private school and get that course?

"A. If it's an accredited school, accredited by North Central.

"Q. Now, so if you have that situation then he can—he can go outside the system perhaps if there is a summer school and get that course outside the system during the summer, can't he?

"A. Yes, that would be possible.

"Q. And then come back into the school the next year and get credit for that course without ever having to go to Douglass?

"A. If it's an accredited high school, yes, sir. By the State Department or North Central rules, then we have to grant credit.

"Q. So that a white student if he wants to and is ingenious can find ways to avoid ever coming in contact with Douglass School?

"A. I think this is possible for a very small minority on any desegregation plan."

in eight senior highschools participating in the Cluster Plan in September 1971, only 1,673 or approximately 12 per cent were participating in an interchange. The School Board presented no direct evidence of the actual numbers of black students participating in an interchange. However, the evidence strongly indicates that the ratio of black students participating is much less than for their white counterparts. By including only the advanced electives in the Cluster Plan, with few exceptions, only the high achievers are participating.

Stripped of the beautiful adjectives and the meaningless promises used to obscure its true intent and effect, the current Cluster Plan is simply a "freedom of choice" plan. It does not work and will not work to desegregate the schools. Of the eight highschools in the plan, four of the highschools are 98 per cent or more white, and one highschool is 100 per cent black. Dunjee is 98.2 per cent black. The impotency of the current plan to accomplish a unitary school system is graphically illustrated by a comparison of the enrollment figures submitted prior to the present plan and the present enrollment statistics.[5] The trend is clearly toward resegregation. Douglass Highschool has again become a one-race school, and Northeast and Harding have become majority black schools. The classes within the cluster schools and the programs are largely segregated. Typically at Douglass, a black highschool, large numbers of white students arrive at the school and sit in white classrooms with few blacks. The converse situation occurs as groups from a school with predominantly black enrollment are transported to a school with a predominantly white enrollment, and upon arrival, sit in a class as a unit or with only two or three white students. A "freedom of choice" plan which does not work cannot be approved. Green v. County School Board, *supra*.

### B. JUNIOR HIGHSCHOOLS.

Of the twelve junior highschools in the system (grades 7–9), it may fairly be said that eleven are substantially disproportionate in their racial composition. Only one junior high (Eisenhower) and the one middle school, Rogers, (grades 6–8), can clearly be said to have lost their racial identity. Eight of the schools are predominantly white having less than ten per cent black enrollment and of these eight, five have less than five per cent black enrollment. There are two schools which are predominantly black, having less than five per cent white enrollment.

In the plan approved by the court, the key provision was for the all black Moon Junior Highschool to be closed for the 1970–1971 school year, and the pupils there assigned to Central, Capitol Hill, Jackson, Jefferson, Roosevelt, and Webster Junior Highschools. Later, however, the School Board decided not to close this school and the court acquiesced in their request to make this material alteration in what appears now to have been misplaced reliance upon the good faith of the School Board. The current plan for junior highschools consists of

5. Comparative study of schools before and after Cluster Plan:

| SCHOOL | DECEMBER 5, 1969 Negro % | SEPTEMBER 10, 1971 Negro % | SCHOOL | DECEMBER 5, 1969 Negro % | SEPTEMBER 10, 1971 Negro % |
|---|---|---|---|---|---|
| Rogers (6–9) | 21.7 | 21.6 | Webster | .2 | .3 |
| Capitol Hill Jr. | 3.7 | 7.9 | Dunjee (7–12) | 99.9 | 98.2 |
| Central | 8.4 | 6.5 | Northwest Classen | 11.5 | 12.2 |
| Eisenhower | 29.6 | 33.2 | Southeast | .2 | .2 |
| Harding | 27.7 | 54.0 | Star Spencer | 20.8 | 22.3 |
| Hoover | .5 | 2.7 | Capitol Hill Sr. | 1.4 | 2.6 |
| Jackson | 1.1 | 9.0 | Classen | 30.1 | 34.5 |
| Jefferson | .1 | .0 | Douglass | 99.6 | 100.0 |
| Kennedy | 99.8 | 100.0 | Grant | .1 | .1 |
| Moon | 99.4 | 99.2 | Marshall | 1.4 | 3.0 |
| Roosevelt | .0 | .0 | Northeast | 41.6 | 65.6 |
| Taft | 14.9 | 9.5 | | | |

a program of interschool and intergroup activities consisting of interschool choral and instrumental groups, exchange assemblies, panels, interschool clubs, science fair, and art festivals. The School Board has no other plan to integrate the junior highschools [6] and it is clear that the current plan will not change the racial identity of a single school. Intercultural exchanges are no substitute for a real plan to convert to a unitary system now.

## C. ELEMENTARY SCHOOLS.

Of the 86 regular elementary schools in the District, 76 are substantially disproportionate in their racial composition. Only 10 can clearly be said to have lost their racial identity.[7] 53 schools have less than 10 per cent black enrollment; 43 of the 53 have less than 5 per cent black enrollment. 16 schools are predominantly black; of the 16, 7 are 100 per cent black, and the remaining 9 have at least 97.8 per cent black enrollment.

On November 20, 1970, Defendant School Board filed a plan for the desegregation of the elementary schools in the system, which it referred to as the "OPENING DOORS IN EDUCATION" plan. This plan provides for grouping of the elementary schools for periodic regularly scheduled joint activities. Groupings are arranged to contain pupils of all racial and socio-economic groups found in the population of the community. It does not make any provision for kindergarten through the third grade. Pupils in grades 4, 5, and 6 may participate *with parental permission only*. Each group of schools is supposed to take part in a variety of special programs. Regular classroom activities would take place within the individual schools. Special programs include the exchange

of a portion of the student body between schools; groupings of the same grade from several schools or groupings of all three grades from a selection of schools for special programs such as a symphony concert; an art lecture—demonstration; visits to the zoo, libraries, and parks; informal seminars with artists, musicians, writers, businessmen, athletes, and the like. For the school year 1971–1972, seven one-half day experiences were scheduled for the fourth grade, eight for the fifth, and nine for the sixth grade. A voluntary program which during the school year involves not at all the first three grades, the fourth grade for only three and one-half days, the fifth grade for four days, and the sixth grade for four and one-half days is obviously only a token effort toward desegregation. It cannot even be described as a good-faith gesture toward constitutional requirements. The "experiences" no doubt are enjoyed by the children and may perhaps be worthwhile, but the dual system of the School District remains unaffected. The constitutional mandate is not for integrated "experiences," but for a desegregated school system. Isolated opportunities for inter-relation between the races cannot convert a dual system to a unitary one.

## II

### THE CONSULTANTS' PLAN

The substance of the CONSULTANTS' PLAN is for a return to the original concept of the Cluster Plan. It would add social studies as a specialized area in one of the highschools of each cluster. It would concentrate a subject area specialization in only one senior highschool. One highschool in each cluster would specialize in science, another in

---

6. Transcript of Hearing, September 21, 1971, p. 129:

"Q. [Mr. Walker] But in terms of classes, Doctor, you have no plans to integrate for every day in the year every class period in the day the actual learning experiences of those youngsters in all of the schools of the junior high level?

"A. [Dr. Lillard] No, other than described in our activities report."

7. Edgemere, 14.4% Negro; Horace Mann, 17%; Mark Twain, 23.5%; Nichols Hills, 24.2%; Putnam Heights. 13.1%; Riverside, 25.7%; Ross, 21.9%; Spencer, 25.1%; Stand Watie, 20.8%; Woodson, 21%.

mathematics, another in social studies, and the fourth in foreign language. It would add all of the required courses in the four areas of subject specialization to the curriculum of the highschool specializing in that subject, and none would be offered in other home-base schools. The plan would assure every student inter-racial exchange experiences in at least two of his three years in highschool. A student in the twelfth grade would participate in an exchange only if he selected an elective subject not offered in his home school. The plan also would make it mandatory for principals in highschools having a subject area of specialization to arrange class schedules of students to achieve as nearly as possible a 50-50 racial mix in cluster classes. Insofar as possible, the plan would also incorporate the lunch period into the cluster interchanges.

The consultants also recommend that the senior highschool cluster plan, with minor adjustments because of the differences in required and elective subjects, be instituted in junior highschools.

For the elementary schools, the consultants propose to group them on the basis of one school with predominantly black enrollment to four or five schools with predominantly white enrollment, so that the grouping would reflect approximately the city-wide ethnic ratio. One school, preferably the one nearest the geographic center of the group, would then be designated as the Interaction Center. All classes in music, art, crafts, drama, physical education, and pre-voca-

tional for all schools in the group would be scheduled at the Interaction Center. Pupils would receive their basic subjects at their neighborhood school, but would be transported to the Center school for the classes indicated. The Consultants' Plan also would involve only grades 4–6.

Although the consultants were proposed by the School Board and the Cluster Plan was its brain child, the School Board treated the Consultants' Plan with great hostility. It objected to the plan because: (1) it would not promote better learning for the students; (2) it would require extensive changes in the physical arrangement and size of the buildings necessary to put the plan into effect; (3) it would require enormous expenditures for transportation facilities, laboratories, and equipment, and in view of the limited financial resources of the District, expenditures necessary to implement the plan would cause a curtailment of educational programs now being offered to the students of the District. The Superintendent of Schools described the plan as not feasible or workable. The Plaintiffs assert that the plan does not fully integrate the schools and that there are more effective alternative plans readily available which would, in fact, desegregate.

The Consultants Plan now stands without a sponsor denounced by friend and foe alike. While the court appreciates the services of the consultants and believes that their suggestions are not without merit,[8] the School Board has peculiar knowledge of that plan which it

8. The Consultants' Plan would result in some change in the racial composition of the senior highschools:

| ENROLLMENT NOW | ENROLL-MENT AFTER PLAN | PERCENT-AGE BLACK NOW | PERCENT-AGE BLACK AFTER PLAN | ENROLLMENT NOW | ENROLL-MENT AFTER PLAN | PERCENT-AGE BLACK NOW | PERCENT-AGE BLACK AFTER PLAN |
|---|---|---|---|---|---|---|---|
| NORTH CLUSTER | | | | SOUTH CLUSTER | | | |
| Marshall: | | | | Grant: | | | |
| 2049 | 2243 | 3 % | 10 % | 2047 | 1951 | .0% | 5.8% |
| Northeast: | | | | Capitol Hill: | | | |
| 987 | 1094 | 65.6% | 44 % | 1998 | 1859 | 2.6% | 9.3% |
| Northwest: | | | | Southeast: | | | |
| 2587 | 2427 | 12.2% | 14.3% | 1683 | 1705 | .0% | 5.7% |
| Classen: | | | | Douglass: | | | |
| 870 | 927 | 34.5% | 29.7% | 1309 | 1444 | 100.0% | 67 0% |

so eloquently presented and defended two years ago. Accordingly the court accepts its assessment of its inherent difficulties and finds the Consultants' Plan neither feasible nor workable.

## III

## PLAINTIFFS' PLAN

### A. SENIOR HIGHSCHOOLS.

The PLAINTIFFS' PLAN for the senior highschools is to convert from a 10–12 grade system to a 9–12 grade system. The plan, however, is not dependent upon this conversion. The essential element of the recommended plan is the restructuring of highschool attendance zones so that each enrolls both black and white pupils. To accomplish this it uses an elementary school feeder system where students are assigned to a highschool based on the elementary school attendance zone in which their home is located. By utilizing the designated elementary schools to feed the senior highschools, no senior highschool would have less than 15 per cent nor more than 30 per cent black enrollment.[9]

### B. JUNIOR HIGHSCHOOLS.

At the junior high level, Plaintiffs propose to change the grade structure from 7–8–9 to 6–7–8. The junior highschools are desegregated by the establishment of attendance zones for each school. The attendance zones are described in terms of the elementary school that the child will have attended. Most of the junior high or middle school zones will be somewhat similar to the present attendance zones except that a large number of the black students will be transported to the outlying junior highschools so as to desegregate those schools. Most of the other changes simply involve a reassignment of schools without an appreciable change in the distance a pupil resides from a school. Moon Junior Highschool will be closed and Kennedy converted to a part of the Douglass-Kennedy Highschool. With the restructured attendance zones for the junior highschools, again no school would have less than 15 per cent or more than 30 per cent black enrollment.[10]

### C. ELEMENTARY SCHOOLS.

Plaintiffs present two different plans for the desegregation of the elementary

9. Summary of Highschool Projected Enrollments:

| HIGH SCHOOL | CAPACITY | PROJECTED ENROLLMENT | APPROXIMATE RACIAL RATIO | HIGH SCHOOL | CAPACITY | PROJECTED ENROLLMENT | APPROXIMATE RACIAL RATIO |
|---|---|---|---|---|---|---|---|
| Capitol Hill | 2139 | 2180 | 20% | Northeast | 1550 | 1600 | 30% |
| Classen | 1550 | 1520 | 25% | Northwest Classen | 2914 | 2580 | 20% |
| Douglass-Kennedy | 2500 | 2440 | 30% | Southeast | 1674 | 1625 | 15% |
| Marshall | 2232 | 2340 | 15% | U. S. Grant | 2139 | 2230 | 15% |

10. Summary of Junior Highschools Projected Enrollments:

| JUNIOR HIGHSCHOOL | CAPACITY | PROJECTED ENROLLMENT | APPROXIMATE RACIAL RATIO |
|---|---|---|---|
| Hoover | 1550 | 1674 | 20% |
| Harding | 1488–1581 | 1569 | 30% |
| Taft | 1302 | 1333 | 15% |
| Central | 1581–2108 | 2162 | 20% |
| Eisenhower | 1302–1736 | 1687 | 30% |
| Roosevelt | 1178–1395 | 1358 | 25% |
| Jefferson | 1581–1705 | 1752 | 15% |
| Capitol Hill | 1426 | 1490 | 20% |
| Jackson | 1178 | 1167 | 20% |
| Webster | 992–1023 | 1354 | 25% |

schools. The first plan would group schools as they are now grouped by the "OPENING DOORS IN EDUCATION" program. In each group the school that is now all black or majority black would serve all fifth grade pupils, while the other schools would serve all of grades 1–4. Within any one of the clusters, black children will be attending what were previously white schools for four years, while the white children will be attending the previously black schools for one year. Otherwise stated, the white students in the group would attend their neighborhood schools for grades 1–4 and would attend the formerly black school for the fifth grade. Black students formerly assigned to the fifth grade Center school would be split up and would attend the majority white schools for grades 1–4. They would then attend the fifth grade in the Center school which would be their neighborhood school. It is suggested that the most feasible method of assignment for the attendance of black students in grades 1–4 is on a geographic basis. If any school in a cluster is already desegregated because residing within its present attendance zone and enrolled in the school are more than 10 per cent black and less than 35 per cent black, then that school would operate as a school enrolling grades K–5.

It is proposed by the Plaintiffs that kindergartens be treated specially and the parents be allowed a choice for kindergarten attendance. All existing elementary schools will house kindergartens. This freedom of choice is justified as permitting kindergarten children to go to the school in the vicinity of the place where the mother may be working or to walk to kindergarten with other siblings or neighborhood children or to go on a bus with other children who may be going to different schools in their cluster.

Under the second plan proposed by the Plaintiffs as an alternative for the elementary schools, the school administration would define new elementary school attendance zones that would increase the number of schools that would fall within the range of 10–30 per cent black and still remain as essentially walk-in schools. The author of the plan suggests that this would be feasible where current black schools are located fairly close to white neighborhoods or where white schools are near black neighborhoods. After some schools are desegregated by boundary changes, all remaining majority black and majority white schools would be grouped on a grade assignment plan as proposed in the first alternative. The kindergarten options would be the same under the second plan as the first.

D. PLAN FOR STAR–SPENCER–DUNJEE AREA.

The area around Star-Spencer Highschool and Dunjee Junior-Senior High poses special problems because of the relative isolation from the rest of the School District. Plaintiffs propose a special plan for the desegregation of the area served by these schools. Parker Elementary School will be discontinued as a regular elementary school. Students residing in its attendance zone would be assigned to Star, Willowbrook, and Telstar. The grade structure in these three schools will be changed from K–6 to K–4. Green Pastures would be desegregated by restructuring its attendance zone. Parker and perhaps some facilities in Dunjee would become a 5–6 grade center, and all students would attend that school for these grades. All students in the area would attend Rogers in grades 7–9 and Star-Spencer in grades 10–12.

The Defendant School Board opposes the Plaintiffs' Plan because it is "based primarily on mixing of students," "ignores quality of education in the desegregation process," and allegedly would cost too much. Even the opponents must concede, however, that the plan can be implemented and that it will desegregate the schools.[11]

11. See Testimony of Dr. Lillard, Transcript, December 9, 1971.

## IV

## THE SOLUTION

From the foregoing observations and findings, it is manifest that we now have a plan that does not work, a plan that will not work, and a plan that will work. In this situation the court has no real choice. It must select the plan that promises realistically to work now.

The court finds that the fears expressed concerning the Plaintiffs' Plan are not justified. The plan would in no way diminish the quality of education in the Oklahoma City Public School System, but would, in fact, add a new dimension of quality, namely, children will learn about the kind of world they really live in and how to live in a biracial society. The plan does not require, and this court does not require, that any particular degree of racial balance or mixing be achieved or maintained. It is not necessary that every school in the District always reflect the racial composition of the total system. The plan uses the ratio of 20 per cent black as a starting point in the process of creating a constitutionally desegregated system, but this is not an inflexible requirement as seen in the considerable variation present in the scheme. The time or distance (a maximum of approximately ten miles) of travel is not so great as to either risk the health of the children or significantly impinge on the educational process.[12] The evidence establishes that the cost of implementation would be neither prohibitive nor unreasonable.[13]

---

12. A comparison study of the average distance between the elementary school a pupil attends and the highschool that student would attend under the current plan and the average distance between the same school and the assigned highschool under the Plaintiffs' Plan illustrates the changes would not be extreme or burdensome. There would be some increase in the distance between students and their highschools in only 31 of 82 central Oklahoma City elementary attendance zones. The so-called "neighborhood school concept" would be preserved for 48 of the 82 zones in that the students residing in those zones would attend the highschool they do now. Students in 35 elementary attendance zones would attend different highschools than the one they presently attend. 30 of the 35 zones would be more than ½ mile farther from their new highschool than the one they are presently attending. 4 elementary school zones (Lafayette, Mark Twain, Putnam Heights, and Stand Watie) will, in fact, be closer to the new assignment than the current one. Only 22 elementary school zones would be more than 3 miles farther from their highschool than they are now and only 7 of these would be more than 6 miles farther. See Court's Exhibits 3–10 which were prepared by School Board staff: Exhibit 3—Capitol Hill; Exhibit 4—Southeast; Exhibit 5—Douglass; Exhibit 6—Grant; Exhibit 7—Northwest; Exhibit 8—Northeast; Exhibit 9—Classen; Exhibit 10—John Marshall.

13. Court's Exhibit No. 1, December 9, 1971, hearing:

"Oklahoma City's school district spends about half as much as the national average on those yellow school buses. That's on the basis of percentage of the district's total budget.

"The total transportation budget for the school system is $756,012 of a $37-million general fund budget, or 2.04 per cent of the total.

"Nationally, school districts average 4.08 per cent and in Oklahoma districts average 3.96 per cent of their total general fund budget for bus transportation, according to Allen Williams, director of pupil transportation services for the 70,000-pupil district that covers nearly 200 square miles.

"The district now owns 71 buses, Williams said. This includes 12 new ones on the road now and 12 more to be delivered November 29. The latest buses cost about $9,500 each and are the larger, 72-passenger variety. Four smaller, 48-passenger buses purchased in December, 1970, cost $8,300 each for hauling physically handicapped and three were specially equipped with hydraulic lifts.

"All told, the district this year uses 166 buses, including 95 that are contracted from private operators. This is less than the total of 175 used last year."

The system now employs 166 buses in the system and in implementing the Plaintiffs' plan would probably need to use

Even if the cost were as great as generally alleged by the School Board, the cost of desegregating the schools of the District is not a valid and legal argument against desegregation. The cost of implementing a plan for desegregation should, of course, be taken into consideration if there are two or more acceptable alternate plans which meet constitutional requirements, and the one with the least expense to implement and which meets these requirements would, no doubt, be approved over others which also meet the constitutional requirements but require an excessive cost. The court encounters no such difficulty here for only one plan meeting constitutional requirements is before the court. The Defendant School Board has presented no plan for the further desegregation of the Oklahoma City Public School System and it has in turn rejected a proposal by the Department of Health, Education, and Welfare, the Consultants' Plan, and the Plaintiffs' Plan. It has not considered presenting any alternatives to the present plan. The Board simply prefers to continue with the plan currently being implemented. Its policy is designed to protect the "neighborhood schools" and to keep desegregation on a voluntary basis.[14] It rationalizes its intransigence on the constitutionally unsound basis that public opinion is opposed to any further desegregation.[15]

This court has never ordered a single child to be bused and does not intend to do so. Busing of children to attend the public schools in the Oklahoma City District is neither new nor novel. Thousands of students are bused daily in the District and as a matter of fact, throughout the state. Part of the cost of busing pupils in this state is reimbursed to the several districts by the State of Oklahoma when the children so bused live one and one-half miles or more from their assigned school.[16]

Bus transportation as a means to eliminate segregation may be validly employed. Although not specifically relied upon by the Defendant School Board, the court should observe that the law enacted by the 1970 Oklahoma State Legislature, Title 70 O.S.A. § 1210.202, which provides:

"No pupil shall be assigned, transferred, or otherwise compelled to attend any school on account of race, creed, color or national origin; and no school district or other authority shall seek to achieve racial balance or overcome racial imbalance by transferring or transporting pupils from one school to another within a district, or from one school district to another; provided, that nothing contained in this section shall prevent the voluntary transfer of pupils to schools in which their race is in the minority, or other transfers not inconsistent with the provisions of this act."

is no obstacle to the performance of its constitutional duty by the School Board. A similar statute in North Carolina was held invalid as preventing implementation of desegregation plans required

---

approximately 200 buses. The Board has a reserve in this year's general fund budget of $1,900,000. $200,000 has been allocated in the general fund budget for the "Opening Doors Program" which could be diverted to implementation of the new plan. The Board also has approximately $5,700,000 worth of bond authority for new construction. Testimony of Dr. Lillard, December 9, 1971, Transcript, pp. 60–62, 72.

14. See Testimony of Superintendent of Schools and Board Members, November 18, 19, and December 9, 1971, Hearings. Two members of the Defendant Board testified that they believed desegregation should only be achieved by voluntary action on the part of the pupil or his parents. The Superintendent of Schools takes the incomprehensible view that the system has been desegregated since 1954 and that a school loses its racial identity when one member of the opposite race is enrolled.

15. Testimony of Board Member Estes, December 9, 1971, Hearing, Transcript, pp. 93, 94.

16. The District this year will receive some $196,000 in state aid for transportation. Court's Exhibit No. 1, December 9, 1971, Hearing.

by the Fourteenth Amendment. North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L. Ed.2d 586, decided April 20, 1971.

This litigation has been frustratingly interminable, not because of insuperable difficulties of implementation of the commands of the Supreme Court of the United States and the Constitution of the United States, but because of the unpardonable recalcitrance of the Defendant Board and the Superintendent of Schools to come forward with a constitutional plan for the desegregation of the schools of this District. The courts have consistently stated in case after case that regardless of the method used by a school board, whether it be freedom of choice, geographic zoning, pairing, or any other method, they may not continue the operation of a dual system of schools. The methods which a school board is bound to consider to bring about a desegregated school system have, to a great extent, been ignored by the Defendant School Board. The burden has been upon the School Board to erase the racial identity of the schools, and this the Board has failed to do. The court, bearing in mind the rationale that a segregated school is inherently unequal and recognizing further that those students who have been and are being subjected to segregated education in the public schools are, regardless of race, having thrust upon them educational infirmities which are constitutionally impermissible, cannot and will not tolerate further delay.

V

SUMMARY

THE COURT THEREFORE CONCLUDES:

1. A dual system has been and is now being maintained by the Defendant School Board.

2. The Defendant School Board has totally defaulted in its acknowledged duty to come forward with an acceptable plan of its own.

3. The current operational plans of the School Board for the senior and junior highschools, as well as the elementary schools, are in essence "freedom of choice" plans which do not effectively convert the dual system to a unitary system.

4. The Defendant School Board has not sought to achieve the greatest possible degree of actual desegregation of schools.

5. In the Oklahoma City School System, with its history of state-imposed segregation, the presumption is against the great number of schools that are substantially disproportionate in their racial composition, and the School Board has failed to establish or illustrate that the racial composition of such schools is not the result of present or past discriminatory action on its part.

6. The court's order of January 16, 1970, approving the "COMPREHENSIVE PLAN FOR COMPLETE DESEGREGATION OF JUNIOR AND SENIOR HIGHSCHOOLS IN THE OKLAHOMA CITY PUBLIC SCHOOLS AFTER THE 1969–70 SCHOOL YEAR" and subsequent orders relating thereto, should be vacated and set aside.

7. The Plaintiffs' Plan would, if adopted and implemented in good faith, create a unitary system.

8. The jurisdiction of this court in this case has been and is continuous until it is clear that disestablishment of the dual system is complete.

These conclusory findings are not by way of limitation to findings previously made during the course of this memorandum, but are deemed to be supplemental thereto.

VI

CONCLUSIONS OF LAW

The Conclusions of Law reached by the court as enunciated in this memorandum have been based upon the following authorities:

1. Racially restrictive covenants are prohibited and violated of the Four-

teenth Amendment. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

■ 2. It is not improper to consider race in disestablishing segregated schools. The racial composition of the whole School System may be used as a starting point in shaping a remedy to correct past constitutional violations. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

■ 3. Plaintiffs are entitled to a decree requiring the reasonably immediate conversion of the Oklahoma City Public Schools into a unitary school system. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19 (1969); Northcross v. Board of Education of Memphis, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970); Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

■ 4. The Defendant School Board has an affirmative duty to convert to a unitary school system in which racial discrimination would be eliminated root and branch. Green v. County School Board of New Kent County, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

■ 5. Transportation is a permissible tool for achieving integration. Swann v. Charlotte-Mecklenburg Board of Education, *supra.*

■ 6. If school authorities fail in their affirmative obligations under the Constitution, judicial authority may be invoked and the scope of a district court's equitable power to remedy past wrongs is broad providing a practical flexibility in shaping remedies. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954); Green v. County School Board of New Kent County, *supra.*

■ 7. It is the continuing duty of the district court to retain jurisdiction over the case until it is clear that the constitutional requirements have been achieved. Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 20 L. Ed.2d 727 (1968).

■ 8. In order for a freedom of choice concept to be a valid remedial measure, it must be effective. Green v. County School Board of New Kent County, *supra.*

■ 9. No procedure, plan, or method will legalize state-maintained segregation. The constitutional test of a plan is whether or not it gets rid of segregation in the public schools and does it "now." Green v. County School Board of New Kent County, *supra*; Monroe v. Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733.

■ 10. The cost of desegregating a school system is not a valid argument against the constitutional mandate to desegregate. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); United States v. Cook County, Illinois, 404 F.2d 1125 (CA7 1968).

■ 11. The fact that public opinion may oppose desegregation of the public schools is not a valid reason for failure to comply with the Constitution. Green v. County School Board of New Kent County, *supra*; Monroe v. Jackson, *supra.*

■ ■ 12. Intercultural exchanges do not meet constitutional requirements for desegregation. Hilson v. Ouzts, 421 F.2d 632 (CA5 1970), and plans for joint sharing of subject matter by students of racially impacted schools and adjacent schools are not a substitute for disestablishing a dual system. Hightower v. West, 430 F.2d 552 (CA5 1970). Part-time desegregation does not comply with mandate that school districts begin immediately to operate as unitary school systems. United States v. Board of Education of Baldwin County, 423 F.2d 1013 (CA5 1970); Bevins v. Bibb County Board of Education, 424 F.2d 97 (CA5 1970).

## VII

## ORDER

For the reasons stated in the foregoing memorandum of the court and deeming it proper so to do, It is adjudged, ordered and decreed:

1. The court's order of January 16, 1970, approving the "Comprehensive Plan For Complete Desegregation of the Senior and Junior Highschools of the Oklahoma City Public School System after the 1969–70 School Year" and any subsequent order relating thereto are hereby vacated and set aside.

2. The Defendant School Board and the individual members thereof, both present and future, together with the Superintendent of Schools, shall implement and place into effect beginning with the school year 1972–1973 A NEW PLAN OF UNIFICATION FOR THE OKLAHOMA CITY PUBLIC SCHOOL SYSTEM which embodies the principles and suggestions contained in the Plaintiffs' Plan attached hereto and incorporated herein by reference. The court specifically approves the plan for the senior highschools, junior highschools, the first alternate plan for the elementary schools, and the plan for the Star-Spencer-Dunjee area.

3. The Defendant School Board shall not alter or deviate from the New Plan without the prior approval and permission of the court. If the Defendant is uncertain concerning the meaning or intent of the plan, it should apply to the court for interpretation and clarification. It is not intended that the school authorities be placed in a "strait jacket" in the administration of the plan, but it is essential that the court be informed of any proposed departure from the sanctioned program. The court is committed to the principles of the plan, but is not inflexible concerning the details. Accordingly the School Board may appropriately consider whether to change to a 5–3–4 grade structure or continue with the present 6–3–3 structure; whether 1973 graduating seniors should be permitted to elect to remain and graduate in the school which they have been attending, if different from the new assignments; and other related matters. Any proposed changes by the school authorities should also be referred to the Biracial Committee constituted by order of this court dated December 3, 1971, for comment and recommendation to the court. The Biracial Committee will also be regularly advised of the progress being made in the implementation of the plan.

4. Some special phase-in programs must be initiated in the spring of 1972. Junior and senior high students and teachers should go to their new school assignments in April or May for special orientation sessions. This will enable scheduling and enrollment problems to be anticipated and rectified. Elementary school students during the spring of 1972 should be introduced to their new assignments and so far as possible should meet with their next year's teachers.

5. It is further provided that this order is binding upon the Defendant School Board, its members, agents, servants, employees, present and future, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise. Rule 65(b), Federal Rules of Civil Procedure. Any attempt to hinder, harass, intimidate, or interfere with the School Board, its members, agents, servants, or employees in execution of this order shall be reported to the Department of Justice through the United States Attorney for the Western District of Oklahoma, Mr. William R. Burkett, Room 4434 Federal Courthouse Building, Oklahoma City, Oklahoma, telephone number 231–4247, for appropriate proceedings to safeguard federally protected rights and activities and to pre-

vent obstruction of this order of the court. See 18 U.S.C. § 245; 18 U.S.C. § 401; 18 U.S.C. § 1509; and 42 U.S.C. § 2000h.[17]

6. Jurisdiction is retained by the court for all further appropriate orders.

[The forty-eight page desegregation plan adopted is omitted from the published opinion. It may be obtained from the Clerk of the United States District Court for the Western District of Oklahoma, Oklahoma City 73102.]

17. 18 U.S.C. § 245:

.   .   .   .   .

"(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

.   .   .   .   .

"(2) any person because of his race, color religion or national origin and because he is or has been—

"(A) enrolling in or attending any public school or public college;

.   .   .   .   .

"(4) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

"(A) participating, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1) (A) through (1) (E) or subparagraphs (2) (A) through (2) (F); or

"(B) affording another person or class of persons opportunity or protection to so participate; or

"(5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1) (A) through (1) (E) or subparagraphs (2) (A) through (2) (F), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate— "shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life."

18 U.S.C. § 401:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

18 U.S.C. § 1509:

"Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

42 U.S.C. § 2000h:

.   .   .   .   .

"Nor shall anything herein be construed to deprive courts of their power, by civil contempt proceedings, without a jury, to secure compliance with or to prevent obstruction of, as distinguished from punishment for violations of, any lawful writ, process, order, rule, decree, or command of the court in accordance with the prevailing usages of law and equity, including the power of detention."