Robert L. DOWELL, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the OKLAHOMA CITY PUBLIC SCHOOLS, INDEPENDENT DISTRICT NO. 89, et al., Defendants.

No. Civ–61–9452–B.

United States District Court,
W.D. Oklahoma.

Dec. 9, 1987.

**1504**

Norman J. Chachkin and Theodore M. Shaw, NAACP Legal Defense Fund, New York City, John W. Walker of John W. Walker, P.C., Little Rock, Ark. and Lewis Barber, Jr., of Barber/Traviolia, Oklahoma City, Okl., for plaintiffs.

Ronald L. Day and Laurie W. Jones of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., for defendants.

William S. Price, U.S. Atty., Oklahoma City, Okl., Wm. Bradford Reynolds, Asst. Atty. Gen., Roger Clegg, Deputy Asst. Atty. Gen., David K. Flynn and Mark L. Gross, Dept. of Justice, Washington, D.C., filed an amicus curiae brief for the U.S.

## MEMORANDUM OPINION

BOHANON, District Judge.

No matter how complex the remedial plan invoked, it is irrational to assume that a school desegregation plan will be able to serve the needs of the community indefinitely. Oklahoma City, or any other community served by a unitary school system, will not remain demographically stable, "for in a growing, mobile society, few will do so." *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 31, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971). Following a unitary declaration in 1977, the

parties are now before the court for reasons directly related to the impact of such demographic change upon the delivery of a quality education to all students.

In 1972, the court ordered the Oklahoma City Board of Education to implement a desegregation decree commonly referred to as the Finger Plan. *Dowell v. Board of Education of Oklahoma City Public Schools,* 338 F.Supp. 1256 (W.D.Okla.1972), *aff'd,* 465 F.2d 1012 (10th Cir.1972), *cert. denied,* 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490 (1972). This decree was designed not only to assist the Board in satisfying its affirmative desgregative obligation, but also to allow the school district to achieve the ultimate goal—unitary status. *Dowell,* 338 F.Supp. at 1272.

After the decree had been successfully implemented, the Board moved to close the case because it had "eliminated all vestiges of state-imposed racial discrimination" and converted the school district into a unitary system. On January 18, 1977, after proper notice and hearing, the court entered an Order finding that the Board had carried out the decree and had "slowly and painfully accomplished" the goal of establishing a "unitary system:"

> Now sensitized to the constitutional implications of its conduct and with a new awareness of its responsibility to citizens of all races, the Board is entitled to pursue in good faith its legitimate policies without the continuing constitutional supervision of this Court. The Court believes and trusts that never again will the Board become the instrument and defender of racial discrimination so corrosive of the human spirit and so plainly forbidden by the Constitution.

ACCORDINGLY, IT IS ORDERED:

1. The Biracial Committee established by the Court's Order of December 3, 1971, which has been an effective and valued agency of the Court in the implementation of the Plan, is hereby dissolved;

2. Jurisdiction in this case is terminated ipso facto subject only to final disposition of any case now pending on appeal.

The $203,333.32 award of attorney fees and costs was the only matter on appeal. This court believed then and continues to believe that the Order Terminating Case quoted above followed the teachings of *Swann.*

For eight years, the Board continued to utilize the techniques of pairing, clustering, and compulsory busing—the tenets of the Finger Plan—through the 1984–85 school year. However, the Board had perceived progressive inequities in the Finger Plan resulting from demographic change in the community. In response, the Board adopted for school year 1985–86 a student assignment plan for grades K–4 which eliminated compulsory busing and assigned students to the elementary school located in the neighborhood where they resided. Eleven of the sixty-four elementary schools had a black student population exceeding 90% due in part to areas of residential segregation in Oklahoma City. The Board instituted the plan believing, as did the court, that the Oklahoma City schools were no longer subject to federal court supervision under *Swann.*

In 1985, the plaintiffs sought to intervene and reopen this action, challenging the School Board's decision to alter the basic method of pupil assignment at the elementary grade level. Following an evidentiary hearing in April, 1985, the court found that its unitary declaration in 1977 was binding and that the school district remained unitary in 1985. Additionally, the court concluded that the neighborhood school plan was constitutional since it was not adopted with the intent to discriminate on the basis of race. Thus, the court ruled that special circumstances did not exist which warranted reopening the case. *Dowell v. Board of Education of Oklahoma City Public Schools,* 606 F.Supp. 1548 (W.D.Okla.1985).

The Court of Appeals concurred that the 1977 unitary finding was binding upon the parties. *Dowell v. Board of Education of Oklahoma City Public Schools,* 795 F.2d 1516, 1522 (10th Cir.1986). However, the Court of Appeals ruled it is only when the order terminating the case also dissolves the desegregation decree that the School

Board "regains total independence from the previous injunction." *Dowell*, 795 F.2d at 1521. Since this court had not expressly dissolved the 1972 decree, the Court of Appeals remanded the case "for further proceedings to determine whether the original mandatory order [would] be enforced or whether and to what extent it should be modified." *Dowell*, 795 F.2d at 1523. In these remand proceedings, the Court of Appeals placed the burden of proof on the School Board: "[t]he defendants, who essentially claim that the injunction should be amended to accomodate neighborhood elementary schools, must present evidence that changed conditions require modification or that the facts or law no longer require the enforcement of the [1972] Order." *Id.*

This court fully intended in 1977 to restore the School Board to total independence and relinquish to the Board all control over the school district. This court is now aware that it should have dissolved the injunction in 1977, as pointed out in the Circuit opinion, because the Oklahoma City schools were at that time, as they are today, operating as a unitary system, wholly without discrimination to blacks or other minority students, faculty or staff.

On February 5, 1987, this court granted the Petition for Intervention and Plaintiffs' Motion to Reopen, and set the matter down for an evidentiary hearing on the merits. The hearing was conducted in June, 1987. Following eight days of testimony, careful review of all trial exhibits, and consideration of the arguments of counsel, the court is now entering its Memorandum Opinion containing its findings of fact and conclusions of law, and holding that the evidence of the defendants far outweighs the evidence of the plaintiffs.

## I.

## WHAT IS THE CAUSE OF CURRENT RESIDENTIAL SEGREGATION IN OKLAHOMA CITY?

█ The fundamental issue the court must address is whether the School Board has shown a substantial change in conditions warranting dissolution or modifica-

tion of the 1972 Order. The existence of residential segregation in certain Oklahoma City neighborhoods has resulted in the existence of the predominantly black elementary schools which are being challenged by plaintiffs. Thus, the cause of the residential segregation which presently exists in Oklahoma City lies at the very heart of the issue the court must determine. A review of the nature of demographic change which took place in Oklahoma City following implementation of the Finger Plan sheds light on the answer.

### A. Demographic Data

#### 1. Past Governmental Barriers

By way of background, the state-compelled dual school system in Oklahoma City was rooted in state constitutional and statutory provisions mandating separation of the races for public educational purposes. Early ordinances in Oklahoma City set aside areas within which blacks and whites were to live. Past developers platted lands with restrictive covenants which prohibited the sale of homes to blacks. In 1963, this court recognized that the residential pattern of white and black people in Oklahoma City had been set by law for a number of years. These early residential patterns had much to do with the segregation of the public schools in Oklahoma City. The east and southeast portions of the original city of Oklahoma City was black, and all other sections of the city were occupied by the white race. *Dowell v. Board of Education of Oklahoma City Public Schools*, 219 F.Supp. 427, 433–34 (W.D.Okla.1963). Thus, the schools for blacks were centrally located in a predominantly black section of Oklahoma City, comprising generally the central east section of the city. Residential segregation was encouraged through a special transfer policy which was implemented by the Board of Education between 1955 and 1963. This "minority-to-majority" policy was stricken down by the court in 1963. *Dowell*, 219 F.Supp. at 442.

#### 2. The East Inner-City Tracts

The nature and extent of demographic change following this state of affairs in

Oklahoma City was illuminated by U.S. census data presented at the recent hearing. A census tract map of the Oklahoma City metropolitan area for 1960 clearly shows the historical concentration of black households in the east inner-city area. (Def. Ex. 2; Tr. 45). The east inner-city area lies within census tracts 13, 27, 28, 29, 30, 38 and 79. (Tr. 66). By 1970 there was a distinct and extensive spread of the black population from this area across school district boundaries to the eastern part of the metropolitan region. (Def. Ex. 3). However, there were few, if any, black households in the northern, western and southern parts of the school district in 1970.

### 3. Relocation Statistics

Following implementation of the Finger Plan, the school district's research department conducted a study of relocation characteristics of the school district's black population. The survey focused on black families with kindergarten children residing in the east inner-city area as of 1974–75, who relocated by 1977–78. The results showed mobility: 148 families moved, but stayed within the east inner-city area; 209 families moved out of the east inner-city area, but did not relocate within the school district; and at least 70 families moved from the east inner-city area to predominantly white sections of the school district lying to the north, west and south. Only 1 of the 70 families moved within the attendance area of the elementary school to which their child was being bused for desegregation purposes. (Tr. 55–60)

The metropolitan census data for 1980 confirmed the trend revealed by the research department's study. There had been a substantial migration of blacks to the northern, western and southern parts of the school district. (Def. Ex. 4; Tr. 61). Also, the Millwood School District, to the east, became predominantly black. (Tr. 65).

Between 1960 and 1980 the east inner-city tracts remained predominantly black. Yet, as the following table reveals, there was a quite substantial decrease in the number of blacks choosing to live in this area:

| TRACT NO. | BLACK POPULATION | | |
|---|---|---|---|
| | 1960 | 1970 | 1980 |
| 13 | 4818 | 5463 | 4198 |
| 27 | 2696 | 1691 | 22 |
| 28 | 6784 | 4554 | 3504 |
| 29 | 3684 | 1183 | 447 |
| 30 | 5066 | 2746 | 853 |
| 38 | 3324 | 1625 | 912 |
| 79 | 2905 | 2747 | 2623 |

In 1960, 84% of all blacks residing in the Oklahoma City metropolitan area lived within these tracts. In 1980, however, only 16.8% of the total black population in the metropolitan area lived in this area. (Def. Ex. 5D; Tr. 67–68).

Also, between 1960 and 1980 there was a substantial amount of turnover in the black population residing in the east inner-city tracts.[1] For example, between 1965 and 1970 the average rate of turnover in the east inner-city area was 42%, and between 1975 and 1980 it was 33.2%. (Def. Ex. 5E). These statistics show a considerable amount of population change going on in the east inner-city area. Some blacks were choosing to live within the area and others were choosing to move away. (Tr. 71). The substantial drop in numbers in the east inner-city tracts between 1960 and 1980 accounts for much of the expansion of the black population throughout other parts of the metropolitan area.[2] (Tr. 71–72).

Since U.S. census data is only gathered every ten years, the latest available data was for 1980. However, the Oklahoma City School District maintained more current data. With this data, one of the Board's expert witnesses, Dr. William Clark, undertook a black population reloca-

1. "Turnover" refers to persons who did not live in the same house five years previously.

2. Between 1960 and 1980, there was a loss of approximately 43,000 whites from the main body of the school district in which the east inner-city area is located, but a gain of over 13,000 blacks. During the same period there was an increase of approximately 12,500 blacks outside school district boundaries in eastern Oklahoma County. Between 1960 and 1980, the white population in eastern, northern and western parts of the metropolitan area outside school district boundaries increased by 127,000. (Tr. 71–73).

tion study similar to the one conducted by the research department in the 1970's. This particular study focused on black families with kindergarten, first grade or second grade children who resided in the east inner-city area in 1982–83, and relocated by 1984–85. Of the families sampled, 324 moved out of the east inner-city area and did not relocate in the Oklahoma City school district. Three hundred five (305) families relocated within the east inner-city area. And, at least 180 black families moved to northern, western and southern parts of the school district. (Def. Ex. 8). Of these, only 2.1% moved into the attendance area of the school to which their children were being bused for desegregation purposes. (Def. Ex. 9; Tr. 76). These relocation studies reveal the compulsory busing of black children to a certain area does not have any appreciable affect on where their parents choose to relocate. (Tr. 76–77).

For a different perspective, another expert witness, Dr. Finis Welch, analyzed the racial composition of the residential attendance zones in the Oklahoma City school district from 1972 to 1986. This analysis revealed that in 1972 there were 39 elementary school neighborhood attendance areas where virtually no black students (fewer than 1%) resided. By contrast, in 1986, blacks resided in every attendance area in the Oklahoma City school district. (Def. Ex. 11, 12, 13). Dr. Welch projected that the integration of Oklahoma City neighborhoods would continue to increase, and that by 1995 no attendance area in the district would have less than 16.2% black students residing there. (Def. Ex. 14).

### 4. Similarity Index and Exposure Index Research

Another means of analyzing the degree of segregation or integration in a defined area is through the use of dissimilarity and exposure indices.[3] The closer the dissimilarity index is to .00 the more integrated (or less dissimilar) the population. More

segregation is shown as the index approaches 1.0. By contrast, the closer the exposure index is to .00, the more segregated (or less exposed) the population, and vice versa. (Tr. 128).

Between 1972 and 1986, the population residing within the Oklahoma City school district decentralized in such a fashion that the exposure of blacks to non-blacks almost doubled. In 1972, the overall exposure index for the residential zones in the school district was .149; by 1986, the increased exposure of the races kicked the index up to .290 (Def. Ex. 40; Tr. 173).

Dr. Welch recently completed a study for the United States Commission on Civil Rights which analyzed, among other things, the degree of segregation in 125 school districts for a period spanning roughly 20 years. (New Evidence on Desegregation, Def. Ex. 27; Tr. 122–23). Of the 125 school districts studied, the Oklahoma City school district experienced the eighth largest reduction in the index of dissimilarity or, in other words, the eighth greatest improvement in integration, during the period from 1968 to 1982. (Def. Ex. 27; Tr. 130–31). In 1986, Oklahoma City ranked as the 39th largest metropolitan area in the country. Today, when the degree of dissimilarity in Oklahoma City, following implementation of the K–4 neighborhood school plan, is compared to the 24th through 56th largest metropolitan areas, the Oklahoma City school district falls in the mid-range. (Def. Ex. 38; Tr. 192). The least segregated is Columbus, Ohio, with a dissimilarity index of .136. The index for the Oklahoma City school district is .389. Birmingham, Alabama, is the most segregated with an index of .743. Even after implementing the K–4 neighborhood school plan, the degree of overall dissimilarity among the races attending school in Oklahoma City was less than that of Tulsa, Oklahoma, whose index was .557. (Def. Ex. 38).

Dr. Welch also compared the dissimilarity index in Oklahoma City following imple-

**3.** The dissimilarity index is a measure of how unevenly distributed the races are in a defined area. The exposure index is an alternative index showing how well integrated a defined area is. (Tr. 127–28).

mentation of the K–4 neighborhood plan with that of other unitary school districts in the country. The comparison was made with school districts which had been declared unitary in cases involving the Justice Department. (Def. Ex. 39). Of the 47 unitary school districts analyzed, the Oklahoma City School District was the 27th most integrated (.389). At the extremes were the schools in Newton County, Georgia, which were the most integrated (.087), and those of Dekalb County, Alabama, the most segregated (.855). Regionally, Oklahoma City schools proved more integrated than those in Austin, Texas (.414) and those in Houston, Texas (.620). (Def. Ex. 39).

The degree of dissimilarity among the races attending schools in Oklahoma City is also of interest. In 1971, before the Finger Plan was implemented, the dissimilarity index district wide was rather segregative at .78. In 1984, the index revealed much more integration at .24, and following implementation of the K–4 neighborhood school plan, the index rose slightly to .38. (Def. Ex. 45; Tr. 187). The increased residential integration in Oklahoma City has resulted in a much lower level of dissimilarity today in the neighborhood elementary schools (.56) than existed in 1971 before the Finger Plan was implemented (.83). (Def. Ex. 44; Tr. 187).

## 5. Racial Composition of Schools Under the K–4 Plan

When viewing the demographic change which has occurred in Oklahoma City, it is helpful to keep in mind what has happened to the racial character of the student body. Between 1969 and 1986, the percentage of white students in the district dropped from 73% to 47%. The percentage of black students increased from 22.7% to 40%. And, the fraction of non-black minority students increased from 4% to 13%. (Def. Ex. 20; Tr. 153). Today, the student body is truly multi-cultural. The following table shows the racial composition of the K–4 neighborhood schools in Oklahoma City the first year the plan was effective. (Def. Ex. 63).

| School | % Black | % Oriental | % Indian | % Spanish | % White | % Non-White |
|---|---|---|---|---|---|---|
| Lafayette | 2.0 | 1.0 | 5.4 | 5.4 | 86.2 | 13.8 |
| Shields Heights | 4.0 | 0.3 | 7.4 | 21.4 | 66.9 | 33.1 |
| Hillcrest | 5.1 | 0.8 | 5.6 | 4.0 | 84.5 | 15.5 |
| Arthur | 5.7 | 1.8 | 8.6 | 4.1 | 79.8 | 20.2 |
| Rancho Village | 5.8 | 1.2 | 4.0 | 5.2 | 83.8 | 16.2 |
| Prairie Queen | 6.2 | 2.2 | 4.3 | 2.6 | 84.7 | 15.3 |
| Parmelee | 6.3 | 1.8 | 8.3 | 4.6 | 79.0 | 21.0 |
| Davis | 6.6 | 6.0 | 6.6 | 15.7 | 65.1 | 34.9 |
| Willard | 6.6 | 3.9 | 19.7 | 28.3 | 41.5 | 58.5 |
| Coolidge | 7.3 | 3.6 | 5.7 | 2.3 | 81.1 | 18.9 |
| Buchanan | 7.5 | 3.7 | 3.0 | 5.8 | 80.0 | 20.0 |
| Lee | 7.7 | 1.3 | 11.0 | 24.5 | 55.5 | 44.5 |
| Southern Hills | 8.0 | 5.1 | 1.1 | 6.8 | 79.0 | 21.0 |
| Van Buren | 8.4 | 0.9 | 11.9 | 3.1 | 75.7 | 24.3 |
| Adams | 8.5 | 0.0 | 4.5 | 7.0 | 80.0 | 20.0 |
| Fillmore | 8.7 | 1.5 | 3.3 | 5.7 | 80.8 | 19.2 |
| Linwood | 9.2 | 1.4 | 3.3 | 1.0 | 85.1 | 14.9 |
| Wheeler | 10.0 | 1.1 | 8.3 | 18.9 | 61.7 | 38.3 |
| Madison | 10.5 | 3.3 | 2.9 | 5.3 | 78.0 | 22.0 |
| Hayes | 10.7 | 0.0 | 4.9 | 3.4 | 81.0 | 19.0 |
| Mark Twain | 10.7 | 0.0 | 10.7 | 10.7 | 67.9 | 32.1 |
| Heronville | 11.0 | 0.7 | 8.2 | 15.4 | 64.7 | 35.3 |
| Kaiser | 11.9 | 2.3 | 0.5 | 4.0 | 81.3 | 18.7 |
| Quail Creek | 13.2 | 0.5 | 0.5 | 0.5 | 85.3 | 14.7 |
| Columbus | 14.9 | 1.3 | 9.5 | 23.5 | 50.8 | 49.2 |
| Pierce | 16.7 | 0.0 | 5.0 | 10.4 | 67.9 | 32.1 |
| Sequoyah | 16.7 | 1.2 | 4.4 | 4.4 | 73.3 | 26.7 |
| Ridgeview | 16.9 | 0.7 | 0.7 | 0.7 | 81.0 | 19.0 |
| Hawthorne | 17.2 | 8.1 | 9.7 | 12.9 | 52.1 | 47.9 |
| Monroe | 19.1 | 3.2 | 1.2 | 3.2 | 73.3 | 26.7 |
| West Nichols Hills | 21.7 | 1.5 | 2.2 | 1.1 | 73.5 | 26.5 |

| School | % Black | % Oriental | % Indian | % Spanish | % White | % Non-White |
|---|---|---|---|---|---|---|
| Westwood | 22.3 | 0.5 | 6.8 | 20.9 | 49.5 | 50.5 |
| Stand Watie | 24.8 | 1.8 | 7.7 | 15.0 | 50.7 | 49.3 |
| Johnson | 27.0 | 0.7 | 1.3 | 6.5 | 64.5 | 35.5 |
| Gatewood | 30.7 | 12.1 | 3.7 | 10.5 | 43.0 | 57.0 |
| Horace Mann | 30.7 | 4.3 | 2.7 | 3.2 | 59.1 | 40.9 |
| Stonegate | 31.0 | 2.3 | 0.6 | 1.6 | 64.5 | 35.5 |
| Putnam Heights | 31.1 | 9.8 | 4.0 | 5.1 | 50.0 | 50.0 |
| Eugene Field | 31.3 | 4.7 | 9.8 | 26.5 | 27.7 | 72.3 |
| Wilson | 31.3 | 11.2 | 4.6 | 6.6 | 46.3 | 53.7 |
| Bodine | 32.7 | 1.9 | 3.2 | 1.4 | 60.8 | 39.2 |
| Arcadia | 35.6 | 0.0 | 6.9 | 2.8 | 54.7 | 45.3 |
| Shidler | 35.9 | 0.0 | 5.9 | 28.9 | 29.3 | 70.7 |
| Britton | 36.5 | 1.7 | 1.7 | 1.7 | 58.4 | 41.6 |
| Rockwood | 39.0 | 0.7 | 6.6 | 11.1 | 42.6 | 57.4 |
| Harrison | 41.6 | 0.7 | 1.3 | 3.9 | 52.5 | 47.5 |
| Oakridge | 43.5 | 1.5 | 3.0 | 1.5 | 50.5 | 49.5 |
| Willow Brook | 46.3 | 1.2 | 1.2 | 2.7 | 48.6 | 51.4 |
| Star | 54.5 | 0.0 | 1.2 | 0.3 | 44.0 | 56.0 |
| Telstar | 55.8 | 1.7 | 3.3 | 2.1 | 37.1 | 62.9 |
| Edgemere | 56.3 | 19.3 | 2.7 | 6.0 | 15.7 | 84.3 |
| Western Village | 60.0 | 3.8 | 0.6 | 0.9 | 34.7 | 65.3 |
| Spencer | 71.6 | 0.6 | 1.4 | 0.6 | 25.8 | 74.2 |
| North Highland | 96.3 | 0.9 | 0.0 | 0.0 | 2.8 | 97.2 |
| Dewey | 96.6 | 0.4 | 0.0 | 0.0 | 3.0 | 97.0 |
| Lincoln | 97.2 | 1.0 | 0.6 | 0.0 | 1.2 | 98.8 |
| Parker | 97.3 | 0.0 | 0.9 | 0.5 | 1.3 | 98.7 |
| Polk | 98.4 | 0.4 | 0.0 | 0.0 | 1.2 | 98.8 |
| Truman | 98.7 | 0.0 | 0.0 | 0.0 | 1.3 | 98.7 |
| Creston Hills | 99.0 | 0.0 | 0.0 | 0.0 | 1.0 | 99.0 |
| Garden Oaks | 99.0 | 0.5 | 0.0 | 0.0 | 0.5 | 99.5 |
| Edwards | 99.5 | 0.0 | 0.0 | 0.0 | 0.5 | 99.5 |
| Longfellow | 99.6 | 0.0 | 0.4 | 0.0 | 0.0 | 100.0 |
| King | 99.7 | 0.0 | 0.3 | 0.0 | 0.0 | 100.0 |
| District | | | | | | |
| Elementary Students | 36.0 | 2.3 | 4.2 | 6.8 | 50.7 | 49.3 |

It is notable that today the students attending K–4 elementary schools in Oklahoma City are 50.7% white and 49.3% non-white minority. While it is true that the new assignment plan resulted in some schools which are 90% or more black, the plan created *no* schools which are 90% or more white. In contrast, prior to the time the Finger Plan was implemented, there were a substantial number of 90% or more white schools in the district. Today, the vast majority of the elementary schools in Oklahoma City are truly racially mixed.

Many jurists and scholars have speculated about the forces which mold the racial composition of neighborhoods. Although these forces are often complex, the evidence here shows they are not unidentifiable. In the old system of state-compelled segregation, unlawful governmental barriers were in large part responsible for the residential segregation of the races. However, over time these barriers have been totally removed.

**B. Removal of Past Governmental Barriers**

In 1935, for example, the Oklahoma Supreme Court declared Oklahoma City Ordinance No. 4524, commonly known as the "Segregation Ordinance," void for being in conflict with the Fourteenth Amendment to the United States Constitution. *Allen v. Oklahoma City,* 175 Okl. 421, 52 P.2d 1054 (1936) (construing *Buchanan v. Warley,* 245 U.S. 60, 38 S.Ct. 16, 16 L.Ed. 149 (1917)). In 1948, by virtue of the United States Supreme Court's decision in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), restrictive covenants were rendered unenforceable in the courts. *See also Correll v. Earley,* 205 Okl. 366, 237 P.2d 1017 (1951). In 1954, the Supreme Court's landmark decision in *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)

(*Brown I*), rendered Oklahoma's constitutional and statutory provisions mandating separation of the races for educational purposes unconstitutional, null and void, and unenforceable. *See Dowell,* 219 F.Supp. at 433.

As the old laws were set aside, new protective legislation took hold. In 1963, the Oklahoma Legislature established the Oklahoma Human Rights Commission and clothed that agency with authority to deal with racially motivated employment discrimination., 74 O.S. § 951, et seq. In 1965, the Oklahoma City Council passed an ordinance which prohibited discriminatory practices at any place of public accomodation. (Oklahoma City, OK, Ordinance 11018 (1965)). In 1968, the Oklahoma Legislature passed an Act to provide for execution within the state of the policies embodied in the Federal Civil Rights Act of 1964. 25 O.S. 1971 § 1101 et seq. In 1970, the Oklahoma City Council enacted fair housing ordinances prohibiting discrimination in housing by financial institutions, real estate brokers or city employees. (Oklahoma City, OK, Code § 21–166.5 (1970)). In 1980, the Oklahoma City Human Rights Commission was created and given authority to cooperate with law enforcement agencies in rectifying any apparent violations of any ordinances pertaining to discrimination and related matters. (Oklahoma City, OK, Ordinance 15702 (1980)). And, the state legislature in 1985 enacted detailed statutes to deter housing discrimination. 25 O.S. § 1451–1453.

The foregoing decisions, statutes and ordinances reveal that not only have the unlawful and deplorable governmental barriers of the past been removed, but that laws have also been enacted to deter governmental discrimination in the future. The testimony of several black witnesses showed that today black people in Oklahoma City voluntarily choose where they wish to reside, unrestricted by the unlawful barriers of the past. (Tr. 313; Tr. 678).

## C. Current Causes of Residential Segregation

Having determined that unlawful governmental barriers of the past have been finally laid to rest, the court views it appropriate to identify the forces presently at work which are molding the racial composition of the neighborhoods in Oklahoma City. In 1985, the United States Commission on Civil Rights called for a study on the causes of residential segregation in America. Dr. William Clark, one of the Board's experts, was commissioned to conduct the study and present findings to the Commission. After presenting his findings to the United States Commission on Civil Rights, Dr. Clark published the substance of his study. *Residential Segregation in American Cities: A Review and Interpretation,* Population Research and Policy Review 5:95–127 (1986); (Def. Ex. 10; Tr. 82). Dr. Clark's study showed that today the factors which influence residential segregation are: (1) economics and housing affordability; (2) personal preferences and social relationships; (3) urban structure; and (4) private discrimination. (Def. Ex. 10; Tr. 84).[4]

Empirical evidence suggests that between 30–70% of racial separation in America today is attributable to economic status. (Def. Ex. 10, p. 1). The gains in black income generally made in the 1960's and

**4.** In addition to the reasons given by the expert witnesses in this case, it is not surprising that many blacks have chosen to remain in the northeast quadrant. The vast majority of the recreational facilities and cultural sites which make Oklahoma City such a desirable place to live are located in the northeast quadrant: the Cowboy Hall of Fame and Western Heritage Center, the Harn Homestead and 1889'er Museum, State Museum of Oklahoma, and the soon-to-be completed, multi-million dollar Remington Park horse racing track. The Lincoln Park complex located on recently re-named "Martin Luther King Avenue" in the northeast quadrant, contains the nationally-renowned Oklahoma City Zoo, the finest municipal golf course, the Kirkpatrick Center Museum Complex and Omniplex, the National Softball Hall of Fame and Sports Complex, the Oklahoma Firefighters' Museum, and the 45th Infantry Division Museum. The City's nationally recognized Northeast High School is located in this quadrant, as is the State Capitol. Additionally, the premier medical research facility, Oklahoma Teaching Hospitals, and the V.A. Medical Center are found in the northeast sector. There can be no argument that the City of Oklahoma City has slighted this sector of the community.

1970's is being expressed in the spatial pattern of black households today. (Tr. 86). With respect to personal preferences, the research shows that black households prefer neighborhoods which are 50% black and 50% white, while white families prefer neighborhoods ranging from 0–30% black. (Def. Ex. 10, p. 1; Tr. 85). Once a neighborhood becomes 25–30% black, research reveals that, due to personal preferences, white households start leaving the neighborhood. However, the neighborhood changes as much because white households prefer not to move into these areas. (Tr. 105). There are very, very small proportions of white households which move into neighborhoods that are predominantly black. (Tr. 105). The current preferences of blacks and whites are not unlike those of other ethnic groups. Vietnamese, Koreans, Japanese and Hispanics each have a high level of preference for people of their own race. (Tr. 111).

Urban structure involves the relationships of cities and suburbs, the patterns of transportation, and the behaviors of individuals. A large number of studies show that households tend to move nearby. This element of the urban structure explains why we see patterns of growth spreading from previously concentrated areas. (Tr. 87–88). Today, private discrimination, such as racial "steering" by realtors, is one factor which contributes to the racial composition of neighborhoods. Yet, it is a much smaller factor than it was 30 years ago. (Tr. 85). Surveys of black households in Kansas City and Little Rock revealed that the vast majority of black families did not view themselves as having been the subject of private housing discrimination. (Def. Ex. 10, p. 119). This does not mean that there have been no acts of private housing discrimination. However, if most real estate transactions were guided by discriminatory intent, it would appear logical that people would report it in their experience more often than they do.

The causes which impact contemporary residential segregation explain why the east inner-city area in Oklahoma City remains predominantly black today. With the removal of the governmental barriers of the past and motivations of housing affordability and personal preferences, a vast number of blacks left the east inner-city area and integrated Oklahoma City's predominantly white neighborhoods. As a result of personal preference, very few white families moved into the east inner-city area. The exodus of a large number of blacks and the lack of white movement into the area has left the east inner-city area much less populated, but still predominantly black.

## D. Summary

From the time of this court's original decision in this case over 25 years ago, the Oklahoma City Board of Education has taken absolutely no action which has caused or contributed to the patterns of the residential segregation which presently exist in areas of Oklahoma City. If anything, the actions of the Board of Education, through implementation of the Finger Plan at all grade levels for more than a decade, have fostered the neighborhood integration which has occurred in Oklahoma City. The Board's use of busing in grades 5–12 cannot help but promote neighborhood integration and deter residential segregation in the future. No court is equipped with the judicial power or machinery necessary to eradicate residential segregation. This phenomenon develops even in the midst of court ordered desegregation. For example, when the Finger Plan was implemented in 1972, the North Highlands attendance area in northern Oklahoma City was not predominantly black. Yet, despite more than a decade of compulsory desegregation, black families voluntarily chose to move into the North Highlands neighborhood. As a result, North Highlands today is predominantly (90% or more) black. Neither this court nor the Oklahoma City Board of Education can govern and control where people choose to live. All expert witnesses agreed there is virtually nothing a court or a board of education can do to eliminate residential segregation in Oklahoma City or elsewhere. In fact, the evidence showed that no desegregation decree has had the effect of eliminating residential segregation anywhere in America.

As the United States Supreme Court observed in *Swann*, 402 U.S. at 31, 91 S.Ct. at 1267, few communities served by school districts with newly acquired unitary status will remain demographically stable. Oklahoma City is no exception. The Supreme Court has also recognized "at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention." *Keyes v. School District No.1*, 413 U.S. 189, 211, 93 S.Ct. 2686, 2699, 37 L.Ed. 2d 548 (1973). That time has arrived in Oklahoma City. While the history of discrimination in Oklahoma City cannot be ignored, it "cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980).

## II.

### WHY WAS THE K–4 STUDENT ASSIGNMENT PLAN ADOPTED?

The Board of Education asserts that over time the substantial demographic changes in Oklahoma City rendered the Finger Plan inequitable and oppressive. The resulting inequity, the Board contends, was the primary factor motivating its adoption of the new student assignment plan at the elementary level. The court will now turn its attention to the validity of the K–4 plan.

### A. Review of the Finger Plan

An understanding of the tenets of the Finger Plan is essential to understanding the asserted resulting inequity. The Finger Plan restructured high school and middle school attendance zones so that each school enrolled both black and white students. A feeder system was used so that students were assigned to a high school or middle school based on the elementary attendance zone in which their home was located. *See generally Dowell*, 338 F.Supp. 1256.

At the elementary level, the majority black schools located in the east inner-city area were converted to fifth-year centers, while all other schools served grades 1–4. White students attended their neighborhood school for grades 1–4, and were bused to the former black schools for the fifth grade. Black students were bused to the majority white schools for grades 1–4, and attended their neighborhood school in the fifth grade. *Id.* at 1268.

If racial balance existed in an elementary neighborhood zone, or was subsequently achieved through demographic change, the elementary school in that zone qualified as a K–5 "stand-alone" school. When the Board recognized "stand-alone" status had been achieved, the fifth grade was returned to the neighborhood elementary school, and children were no longer bused into or out of that neighborhood zone to achieve racial balance. *Id.*

### B. Creation and Adoption of the K–4 Plan

Between 1982 and 1984, studies conducted by the school district's research department revealed that certain inequities directly linked to the K–5 "stand-alone" concept were starting to surface. (Def. Ex. 69–75). When the Board recognized Bodine Elementary School in southeast Oklahoma City as a K–5 "stand-alone" school in 1984, the perceived inequities surfaced once again. As a result, in July of 1984, the Board of Education appointed a committee to study the "stand-alone" school concept and to report back with positive recommendations. The committee was comprised of three School Board members. Dr. Clyde Muse, a black minister with a Ph.D. in education, chaired the committee. The other committee members, Mrs. Susan Hermes and Mrs. Betty Hill, each had prior experience as certified school teachers. The committee met on an almost daily basis at the school district's research department for the purpose of fulfilling its charge. Needed data and statistics were provided to the committee by the district's sophisticated research staff. While the committee was meeting, Dr. Muse traveled to the Office of Civil Rights in Dallas, Texas, for consultation and advice. (Tr. 428).

### 1. Increased Busing Burdens on Young Black Pupils

In November, 1984, the committee presented its report to the Board of Education. The committee study revealed that after the Finger Plan was implemented in 1972, demographic changes slowly took place which integrated more and more neighborhoods, particularly those in central Oklahoma City. In 1985, as a result of these demographic changes, there were approximately 13 elementary schools in neighborhoods with racial balance which qualified for K–5 "stand-alone" status. (Tr. 427). The study revealed that if K–5 "stand-alone" status was granted to the ever increasing number of elementary schools which qualified, then the young black students, previously bused into those schools from the east inner-city area, would have to be reassigned and bused to more distant schools. (Tr. 425). Since most of the racially balanced neighborhoods were centrally located in Oklahoma City, the reassignment of young blacks, the committee explained, would have to be to schools located further north, west or south. The obvious result would be to increase the busing burden, in terms of time and distance, on young black children in grades 1–4. (Tr. 425).

### 2. Closing of Fifth-year Centers in the Northeast Quadrant

In addition, the committee pointed out that when a "stand-alone" school reacquired its fifth grade, this caused the student population at the fifth-year centers located in the east inner-city area to drop. (Tr. 426). Under school district guidelines, if enrollment dropped below a certain level in a given school, the school was subject to closing. The ultimate effect would be to leave a predominantly black part of the community without public schools. All fifth-year centers had enrichment programs which included intramurals, string instruments, special interest sessions and "Opening Doors" programs. The committee found it would be increasingly difficult to make these special fifth-year center programs equally available across the district

to all of the potential K–5 "stand-alone" schools. (Def. Ex. 95).

### C. Experts Acknowledge "Stand-Alone" Inequities Existed

It is significant to the court that plaintiffs agree with the defendant Board that the Finger Plan ultimately proved inequitable. Dr. Finger testified that compulsory desegregation plans are not designed to last forever and that changes in plans become necessary as a result of demographic forces. (Tr. 1192). He acknowledged the increased busing burden on young blacks and the potential for the loss of fifth-year centers as a result of the "stand-alone" feature in the plan. (Tr. 1202). In fact, Dr. Finger expressed surprise that the plan had not already been modified as a result of demographic change. (Tr. 1198–99).

Another expert for plaintiffs, Dr. Gordon Foster, also agreed that the inequities resulting from the "stand-alone" feature justified modification of the plan. (Tr. 1266–67). Counsel for plaintiffs assert that the method of pupil assignment under the Finger Plan was not fully equitable and that these inequities were exacerbated by the "stand-alone" school concept. In the Pretrial Order, "Plaintiffs' Contentions" (Appendix "A", p. 3), counsel for the plaintiffs states:

> The "stand-alone school" feature of the original Finger Plan, over time, increased the burdens borne disproportionally by Black children. As new areas of the district qualified for "stand-alone" status the distances which Black students in grades 1–4 would have to be transported increased and the likelihood that schools in black residential areas would be closed increased.

In plaintiffs' Trial Brief (p. 14) counsel states:

> One of the principal bases advanced in 1985 for the system's adoption of a new assignment plan in grades 1–4 was the inequitable burdens being borne by Black students residing in northeastern Oklahoma City. These concerns are legitimate ones which are shared by plaintiffs.

Expert witnesses for the defense also confirmed inequity flowing from the "stand-alone" school concept. Dr. Finis Welch stated that in his opinion the Finger Plan was designed for a district that is 20% black. According to Dr. Welch, in light of the overall demographic change in the community, the plan could not last and was destined to fail. As Dr. Welch explained, demographic change directly affected the "stand-alone" school feature so as to "whiplash" the remainder of the district with increased busing burdens. (Tr. 219–21). Dr. Welch pointed out that if the "stand-alone" feature was followed year-by-year into the future, the inequity flowing from the "stand-alone" concept would continue to increase. (Tr. 222–25).

### D. Summary

This court agrees with the parties and concludes without question that, over time, demographic change in Oklahoma City has rendered the "stand-alone" school feature in the Finger Plan inequitable and oppressive. In so ruling, the court is mindful of *Swann*'s admonition that "[a]n objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process." 402 U.S. at 30, 91 S.Ct. at 1283.

Since all parties agree and the court concurs, that tenets of the Finger Plan proved inequitable and oppressive by virtue of demographic change, the remaining question becomes whether the inequity warrants dissolution or modification, and if so, to what extent. However, before reaching any conclusions with respect to dissolution or modification, the court deems it imperative to determine if the Oklahoma City School District has maintained its unitary status since 1977.

### III.

### HAS THE SCHOOL SYSTEM RETAINED ITS UNITARY STATUS?

■ Six separate components of a school system must be non-discriminatory before total unitary status can exist: (1) faculty; (2) staff; (3) transportation; (4) extra-curricular activities; (5) facilities; and (6) the composition of the student body. *Green v. County School Board of New Kent County*, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968). At the time this court totally relinquished jurisdiction in 1977, the court was convinced that the Finger Plan had been carried out in a constitutionally permissible fashion and that the school district had reached the goal of becoming a desegregated, non-racially operated, and unitary school system. The Tenth Circuit Court of Appeals recognized that this non-appealed unitary finding is binding upon the plaintiffs. *Dowell*, 795 F.2d at 1522.

### A. K–4 Plan Was Adopted Without Discriminatory Intent

■ A once unitary school district may lose its unitary status by partaking in intentionally discriminatory acts creating de jure segregation. The potential for such regression is recognized in the *Swann* decision which, however, warned that a district court's intervention subsequent to the achievement of unitary status is not anticipated "absen[t] ... a showing that ... school authorities ... ha[ve] deliberately attempted ... to affect the racial composition of [its] schools." *Swann*, 402 U.S. 1, at 32, 91 S.Ct. 1267, at 1284. In its *Keyes* decision, the Supreme Court reaffirmed this aspect of *Swann* and recognized that "at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of de jure segregation warranting judicial intervention." *Keyes*, 413 U.S. at 211, 93 S.Ct. at 2698.

The *Swann* and *Keyes* decisions, therefore, stand for the proposition that subsequent to the achievement of unitary status, the de facto/de jure distinction mandates a search for discriminatory intent before governmental action may be declared unconstitutional. The relevancy of intent under these circumstances was again emphasized by the Supreme Court in its *Dayton I* decision:

The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which [was] *intended* to, and did in fact, discriminate against minority pupils, teachers, or staff. (Emphasis added).

*Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (*Dayton I*).

Although the Court of Appeals held that the plaintiffs herein do not have the burden of proving discriminatory intent, the court did not rule that the question of intent was irrelevant. To the contrary, the court examined this court's findings in 1985 with respect to discriminatory intent to determine if reversal would be futile. The Court of Appeals concluded that the plaintiffs were not prepared to address this substantive question and remanded the case for further factual determinations. *Dowell*, 795 F.2d at 1523. Even though the Oklahoma City School District had earlier achieved unitary status, the Court of Appeals directed that on remand the defendant Board of Education would carry the burden of proof since the original decree had never been dissolved.

■ At trial, the Oklahoma City Board of Education carried the burden of proof; this court concludes that the Board proved by a preponderance of the evidence that its new student assignment plan was adopted without the intent to discriminate on the basis of race. As the court noted earlier, adoption of the new plan was primarily motivated for the legitimate and non-discriminatory purpose of avoiding the oppressive realities demographic change cast upon the "stand-alone" school concept.[5]

### B. K–4 Plan Was Adopted For Legitimate, Non-Discriminatory Reasons

#### 1. Parental Involvement

However, the evidence disclosed there were additional non-discriminatory reasons why the Oklahoma City Board opted for neighborhood schools at grades K–4. One such reason was to increase the degree of parental involvement in the schools. As Professor James Coleman writes, "government policies must, to be effective, anticipate parental decisions and obtain the parents' active cooperation." Coleman, *New Incentives for Desegregation*, 7 Human Rights 10, 13 (1978). In 1969, there were 95 parent-teacher associations (PTA's) in the Oklahoma City School District with a total membership of 26,528. (Def Ex. 140, p.2). At the time the Board adopted the new plan in 1985, the number of PTA units had decreased to 15 and the total membership had dropped to 1,377. (Def. Ex. 140, p.2). When the Board adopted its new plan it was convinced, and virtually every expert in this case agrees, that *parental involvement is essential to student academic achievement and a quality education.* (Tr. 515, 736, 849, 891, 916, 1066–68, 1455). The evidence shows that the Board previously took steps in an effort to increase the level of parental involvement. For example, an attempt was made to implement a district-wide parents' council. School Board meetings were moved out into the community. Buses were sent to certain schools to pick up parents for meetings. However, all of these efforts failed. (Tr. 515–16, 594).

The Board believed that neighborhood elementary schools would increase parental

---

**5.** The Supreme Court addressed the burden of proof issue, at least with respect to dual systems, in two cases. In *Swann* the Court ruled that "[w]here the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory." 402 U.S. at 26, 91 S.Ct. at 1281. And, in *Keyes*, the Court explained that "where a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent ... segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts." 413 U.S. at 210, 93 S.Ct. at 2698. It appears the Tenth Circuit places the same burden on a unitary district where the original desegregation decree has never been dissolved.

involvement, and they were correct. After the plan was in operation for just one year, the number of PTA organizations increased by 100% and PTA membership increased by 80%. Following the second year of implementation, the number of PTA organizations had increased a total of 200% and PTA membership had increased by a total of 144%. (Def. Ex. 139–40). Following the implementation of the plan, the number of elementary parents attending open house and parent/teacher conferences substantially increased as well. Open house attendance was up 5,167 and 3,745 more parents attended parent/teacher conferences in 1986–87 than in the year preceding the plan. (Def. Ex. 140, 144–46).

## 2. Community Involvement

An increase in the level of community involvement with the public schools was also noted following implementation of the plan. The school system has an Adopt-A-School program under which local businesses and organizations donate time, goods, or services to particular schools in the district. The second year the plan was in operation there were 349 adopting organizations, making a total of 522 adoptions. By contrast, the year before the plan there were 53 adopting organizations, making a total of 111 adoptions. (Def. Ex. 142–43). A substantial amount of expert testimony was presented at trial which directly related these increases in parental and community involvement to the adoption of the K–4 neighborhood plan. (Tr. 349–50, 428–29, 518–20, 584–85, 630, 736–37, 775, 853–54, 868, 897, 919).

## C. K–4 Plan's Adoption Does Not Disturb the Components of the Unitary School System

### 1. Racial Imbalance Alone Does Not Mandante A Non–Unitary Finding

In reaching the conclusion that the Board did not adopt its new plan with discriminatory intent, the court sharply focused on the racial composition of the predominately black schools which came into being as a result of the neighborhood plan. Plaintiffs point out that many of the schools which were predominately black before the Fin-

ger Plan was implemented are predominately black today as a result of the neighborhood plan. Plaintiffs make much of the point that when the Board adopted the new plan, they incorporated the same neighborhood attendance zones that were used prior to the time the Finger Plan was implemented. However, this argument cuts both ways. The fact that the Board never gerrymandered the geographic composition of its neighborhood attendance zones also demonstrates that the Board in no way resisted the expansive migration of blacks into predominately white neighborhoods. The court also views it as significant that one of Plaintiffs' experts who had thoroughly investigated the case, Dr. Mary Lee Taylor, testified on cross-examination that in her opinion the Board did not adopt the plan with discriminatory intent. (Tr. 1238).

In sum, the only evidence which could support the notion that the Board adopted the plan with discriminatory intent is the fact that the plan did have a disproportionate impact upon some blacks in the district. However, the Supreme Court has reiterated that *discriminatory intent may not be inferred solely from the disproportionate impact of a particular measure upon one race. Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). *See also, Dayton Board of Education v. Brinkman,* 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720. (1979) (*Dayton II*) ("The foreseeability of segregative consequences" is insufficient to make out a prima facie case of purposeful racial discrimination.).

■ Furthermore, the United States Supreme Court "has consistently held that the Constitution is not violated by racial imbalance in the schools, without more." *Milliken v. Bradley,* 433 U.S. 267, 280 n. 14, 97 S.Ct. 2749, 2757 n. 14, 53 L.Ed.2d 745 (1977) (*Milliken II*). *See generally Dayton II,* 443 U.S. at 531 n. 5, 99 S.Ct. at 2976 n. 5 (Mere "racial imbalance ... is not per se a constitutional violation."); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) (The ex-

istence of both "predominately black and predominately white schools in a community is not alone violative of the Equal Protection Clause."); *Pasedena City Board of Education v. Spangler*, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976) (An order contemplating the "substantive constitutional right [to a] particular degree of racial balance or mixing" is infirm as a matter of law.); *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281 (The existence of some one-race schools within a district "is not in and of itself the mark of a system that still practices segregation by law".). Therefore, "a neighborhood school policy in itself does not offend the Fourteenth Amendment." *Crawford v. Los Angeles Board of Education*, 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217 n. 15, 73 L.Ed.2d 948 (1982). It follows that a school board serving a unitary school system is free to adopt a neighborhood school plan so long as it does not act with discriminatory intent.

The search for unitariness, however, involves more than an analysis of the composition of the student body. In 1973, the Supreme Court emphasized that "[i]n addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration" in determining whether or not a system is governed by de jure segregation. *Keyes*, 413 U.S. at 196, 93 S.Ct. at 2691. A review of these additional factors, therefore, is appropriate with respect to Oklahoma City.

2. *Integrated Faculty And Staff Assignments Support A Unitary Finding*

In 1963, the predominately black elementary schools in Oklahoma City employed all black principals and all black teachers. *Dowell*, 219 F.Supp. at 445–46. In contrast, today the principals and teachers at all schools, including the predominately black K–4 elementary schools, are both black and white. (Def. Ex. 187, 201). Thus, young black students continue to have contact with and the opportunity to learn from white teachers, and conversely, white students continue to have similar opportunities to meet, know and learn from black teachers. Interaction of this nature is desirable, and does not occur in truly segregated schools. *Columbus Board of Education v. Penick*, 443 U.S. 449, 467, 99 S.Ct. 2941, 2951, 61 L.Ed.2d 666 (1979).

■ Although the faculties serving the elementary schools in Oklahoma City have remained integrated since the 1972 decree was implemented, they have not remained in perfect racial balance. Yet, to this day, the Board of Education continues to strive for balance through the implementation of its Affirmative Action Plan. (Def. Ex. 188; Tr. 802–03). Plaintiffs assert that vestiges of segregation remain in Oklahoma City since some of the schools with a higher concentration of black students have more black teachers than other elementary schools. The court finds this contention without merit. The Constitution does not freeze the black-white faculty ratio as of the date of the initial faculty desegregation. Once successful desegregation has occurred and a school system has achieved unitary status, "the system-wide racial ratio may thereafter change from time to time as a result of non-discriminatory" action. *Carter v. West Feliciana Parish School Board*, 432 F.2d 875, 878–79 (5th Cir.1970). *Accord Lee v. Walker County School System*, 594 F.2d 156, 159 (5th Cir. 1979). Indeed, "after faculty desegregation has been effectuated by remedial orders based on racial ratios," a school board is not obligated to make personnel decisions on the basis of such ratios. *Lee v. Russell County Board of Education*, 563 F.2d 1159, 1163 (5th Cir.1977).

The evidence in this case showed that when the 1985 student assignment plan was implemented, the Board of Education entered into negotiations with the teachers' union to address the question of teacher assignments. Under the negotiated agreement, the teachers with seniority had more discretion in selecting their teaching assignment. (Tr. 548–49). Teacher and administrator preferences, to a large extent, determined faculty assignments following implementation of the plan. (Tr. 549). Where teachers lived, no doubt, influenced

their preferences about where they wished to work. The court therefore concludes that teacher assignments in the school district were not motivated by discriminatory purposes. Moreover, the evidence showed that last year the Oklahoma City Board took action pursuant to its Affirmative Action Plan which will have the effect of bringing elementary faculties into racial balance in 1987–88. (Tr. 809).

### 3. Attitudes Of Community And Administration Support A Unitary Finding

As noted above, the attitudes of members of the community and the school administration are relevant in determining whether or not a school system is governed by de jure segregation. At the hearing, a substantial number of black school administrators and black patrons unequivocally testified that in their opinion the Board's K–4 neighborhood school plan was not discriminatory and did not result in the recreation of a dual school system. (Tr. 338, 431, 566, 576, 679, 798, 815).

### 4. Equitable Facilities And Expenditures Support A Unitary Finding

The uncontroverted evidence in this case showed that the school facilities under the neighborhood plan are not discriminatory. (Tr. 788, 832, 885, 893–94). Since most of the predominately black schools today served as fifth-year centers under the Finger Plan, they are actually in much better condition today than, for example, many elementary schools in southeast Oklahoma City. (Tr. 356). Of particular interest is the fact that expenditures made by the Board for the students in the predominately black elementary schools is greater than that made in the elementary schools with a black population of less than 10%. (Def. Ex. 126).

### 5. Additional Factors Support A Unitary Finding

Plaintiffs did not dispute that the present curriculum and extra-curricular activities in the school district are non-discriminatory. A mass of documentary evidence was admitted showing beyond question that the Board is not discriminating in these areas. (Def. Ex. 111–24). Additionally, the court views it as significant that the Board has elected to employ intelligent and competent black individuals in upper-echelon central office administrative positions. (Tr. 542–43). The diversity among the faculty and staff was graphically demonstrated by the employees testifying during the trial:

| Black | White |
|---|---|
| Belinda Biscoe<br>Admins. for the Department of Support Programs (Tr. 295) | Maridyth Montgomery McBee<br>Senior Research Associate (Tr. 534) |
| Vern Moore<br>Executive Director of Personnel Services (Tr. 540) | Dr. Carolyn Sue Hughes<br>Assistant Superintendent for Curriculum and Program Development (Tr. 682) |
| Betty G. Hopkins Mason<br>Assistant Superintend for Instruction and Related Services (Tr. 571) | Dr. Arthur Wayne Steller<br>Superintendent of Okla. City Public Schools (Tr. 697) |
| Odette M. Scovey<br>Teacher/Principal for 27 years (Tr. 785) | |
| Linda Joyce Johnson<br>Affirmative Action Program Planner (Tr. 798) | |

No doubt, their presence will serve to deter racially discriminatory actions or any attempt to return to the dual system.

### D. Summary

Taken together, the foregoing factors lead the court to conclude that the Oklahoma City School District has remained unitary from 1977 to the present.

## IV.

### SHOULD THE 1972 DECREE BE ENFORCED, MODIFIED OR DISSOLVED?

#### A. The Legal Test To Be Employed

■ With an understanding of the conditions presently existing in Oklahoma City, the court now shifts its attention to the fundamental issue on remand: Should the 1972 desegregation decree be enforced, modified or dissolved? The Court of Appeals has articulated guidelines which govern the dissolution or changing of mandatory decrees. *Securities and Exchange Commission v. Jan-Dal Oil & Gas, Inc.,* 433 F.2d 304, 305 (10th Cir.1970) (An injunction may be dissolved or modified where the underlying facts have so changed that the dangers prevented by the injunction have "become attenuated to a shadow."); *Securities and Exchange Commission v. Thermodynamics, Inc.,* 464 F.2d 457, 460 (10th Cir.1972) (In vacation proceedings, an injunction may be dissolved where there is a showing of "some substantial change in law or facts."); *E.E.O.C. v. Safeway Stores, Inc.,* 611 F.2d 795, 800 (10th Cir.1979) (A decree may be vacated or modified where it is shown that changed conditions have produced "hardship so extreme and unexpected" as to make the decree oppressive.). The decisions of the Court of Appeals establishing these guidelines all point to one primary source of authority—the Supreme Court's decision in *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). Therefore, an understanding of the context within which the *Swift* case was decided is essential. This was succinctly explained by the Supreme Court when it subsequently handed down its decision in *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). *Swift* emphasized the power of a court of equity "to modify an injunction in adaptation to changed conditions though it was entered by consent." 286 U.S. at 114, 52 S.Ct. at 462. The question in *Swift* was "whether enough had been shown to justify modification. *Id.* at 115, 52 S.Ct. at 462. *United Shoe* points out that the danger of monopoly which led to the initial decree in

*Swift* had not been removed. Thus, although in some respects the *Swift* decree had been effectuated, there was still a danger of unlawful restraints on trade which justified perpetuation of the decree. *United Shoe,* 391 U.S. at 248, 88 S.Ct. at 1499.

In *United Shoe,* the Supreme Court clarified the meaning of its prior decision and cautioned that its earlier statement in *Swift*—"nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change [the decree]"—must be read in the context of the continuing danger of unlawful restraints on trade which the Court found still existed. *Id.* In conclusion, the Court in *United Shoe* held, "*Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may *not* be changed ... if the purposes of the litigation as incorporated in the decree ... have not been fully achieved." *Id.* Thus, in the process of determining whether dissolution or modification is warranted, it is essential for the court to determine whether the "purposes of the litigation," as incorporated in the 1972 desegregation decree, have been fully achieved.

#### 1. The Purposes Of The 1972 Injunction Have Been Fully Achieved

In *Swann,* the Supreme Court identified the "purpose" of a desegregation case:

Our objective in dealing with the issues presented in these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.

402 U.S. at 23, 91 S.Ct. at 1279.

■ Since there is no substantive constitutional right to "any particular degree of racial balance or mixing ... [t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Id.* at 24, 91 S.Ct. at 1280. It is, therefore, clear that the purpose of a de-

segregation case is not to maintain racial balance in the public schools. Rather, the repeated mandate in each of the Supreme Court's decisions from *Brown I* to *Swann* is "the elimination of the discrimination inherent in the dual school systems." *Id.* at 22, 91 S.Ct. at 1279. Thus, the "target" of a desegregation case is the "dual school system," and the remedy commanded is to dismantle the dual school system. *Id.* The Oklahoma City School District dismantled the dual system and met this objective in 1977, when it was declared unitary. Accordingly, perpetuation of the 1972 decree no longer serves the objective of this case.

The purpose of a desegregation remedy is to "correct" the condition that offends the Constitution. *Id.* at 16, 91 S.Ct. at 1276. It may not be more extensive than is necessary to eliminate the constitutional violation. *Brennan v. Armstrong*, 433 U.S. 672, 673, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); *Milliken II*, 433 U.S. at 281–82, 97 S.Ct. at 2757–58; *School District of Omaha v. United States*, 433 U.S. 667, 669, 97 S.Ct. 2905, 2906, 53 L.Ed.2d 1039 (1977). Thus, the remedy may not be "aimed at eliminating a condition that does not violate the Constitution." *Milliken II*, 433 U.S. at 282, 97 S.Ct. at 2758. If it were not for certain areas of residential segregation presently existing in Oklahoma City, the court is convinced that the plaintiffs would not have the defendant Board engaged in the present contest. In essence, plaintiffs are asking this court, contrary to the teaching of *Swann*, to perpetuate a remedy to "correct" a condition that does not violate the Constitution. As the court noted earlier, *the Oklahoma City Board of Education is not responsible for the present state of residential segregation in Oklahoma City.* As Justice Powell stated in his concurring opinion to grant certiorari in *Austin Independent School District v. United States*, 429 U.S. 990, 994, 97 S.Ct. 517, 519, 50 L.Ed.2d 603 (1976):

> The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing—whether public or private—cannot be attributed to school authorities. Economic pressures and voluntary preferences are the primary determinants of residential patterns.

Plaintiffs are also proposing that this court perpetuate a remedy which *cannot* correct the condition they object to—residential segregation. Virtually all experts in this case agreed that no compulsory desegregation plan implemented by a public school system can eliminate residential segregation, regardless of how long the plan is in operation. (Tr. 115–16, 1028–29, 1245–46). Under plaintiffs' rationale, this court should continue the busing of young students in Oklahoma City until such time as racial balance exists in all neighborhoods. Yet, plaintiffs do not suggest how the school district should go about creating this balance or what kind of order this court could enter that might, as a practical matter, have a chance of changing the present patterns of residential segregation. If this court were to continue the busing of young students until residential segregation no longer existed, then the court would be ordering busing in perpetuity. Such action would be oppressive to the citizens of this community, unrelated to the objective of a school desegregation case, and beyond the scope of an unlawful discrimination remedy. As the United States Supreme Court stated in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 276, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260, 270 (1986).

> Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy.... No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future.

■ It is important to note that a remedial desegregation decree is not designed to continue in perpetuity. Rather, "the displacement of local government by a federal court is presumed to be temporary."

*Spangler v. Pasadena City Board of Education,* 611 F.2d 1239, 1241 (9th Cir.1979). The remedy is designed to operate during the "interim period when remedial adjustments are being made" to eliminate the dual school system. *Swann,* 402 U.S. at 28, 91 S.Ct. at 1282. When "the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated," the school district becomes unitary. *Id.* at 32, 91 S.Ct. at 1284. At that point in time, the "court-ordered remedy has accomplished its purpose (and) jurisdiction should terminate." *Spangler,* 611 F.2d at 1242 (Kennedy, C.J. concurring). The perpetual relief sought by the plaintiffs is in direct conflict with these constitutional principles.

In sum, this court concludes that the purposes of the litigation as incorporated in the 1972 decree have been fully achieved. The desegregation order entered in 1972 has fully served its purpose during the "interim period" and accomplished its task of "correcting" the condition that offended the Constitution. This court found the school district unitary and terminated jurisdiction in 1977. The court's unitary finding in 1977 signified that the purposes of the litigation had been fully achieved. The dual school system had been dismantled. Moreover, the school district's continued adherence to the fundamental tenets of the Finger Plan at all grade levels through school year 1984–85 further insured that all vestiges of prior state-imposed segregation had been completely removed. Undoubtedly, after proper implementation for more than a decade, the dangers prevented by the 1972 decree have "become attenuated to a shadow." *See Jan–Dal,* 433 F.2d at 305. Today, no child in Oklahoma City is denied admission to school on the basis of race. Nor is the particular school a child attends determined by race. Rather, where a child attends school in Oklahoma City today is determined on a race-neutral basis by where the child resides.

2. *Substantial Demographic Change Since 1972 Requires Dissolution Of The Injunction*

The Finger Plan appropriately served its purpose during the interim period when remedial adjustments were being made to dismantle the dual school system in Oklahoma City. However, even the Plan's author never intended the Plan to operate in perpetuity. Over time, demographic change in Oklahoma City rendered the "stand-alone" school feature of the Finger Plan inequitable, as is evidenced by the "whiplash" effect it had on the community. The greater the number of "stand-alone" schools, the greater the busing burden placed on young black children. More "stand-alone" schools meant fewer fifth-year centers with fewer schools located in the northeast section of Oklahoma City. With demographic change, the "stand-alone" school feature indeed produced "hardship so extreme and unexpected as to make the decree oppressive." *See Safeway,* 611 F.2d at 800.

**B. Summary**

When the Oklahoma City School Board adopted its 1985 student assignment plan, it was unitary; and the purpose of this litigation had been fully achieved. The same remains true today. The "substantial change in conditions" which over time resulted in the elimination of illegal discrimination and satisfied the objective of this case is precisely the change which compels dissolving the 1972 decree. As the facts and law no longer require its enforcement, the desegregation decree entered by this court in 1972 should be dissolved.

**V.**

**WHAT ARE THE FUTURE EFFECTS OF THE K–4 PLAN?**

Plaintiffs, and those similarly situated, should not fear today's decision, for the Constitution remains intact. Should the Oklahoma City School Board or any other governmental agency go astray, any person adversely affected is free to return to the federal court system, and upon proof of a new constitutional violation, the court will award appropriate remedial relief.

Yet, as the court revealed previously in this decision, the Board's adoption of the 1985 student assignment plan calling for neighborhood elementary schools did not

violate the Constitution. The Board adopted the plan for the purpose of avoiding the progressive inequity of the "stand-alone" school feature in the Finger Plan and enhancing academic achievement through increased parental and community involvement and pride in the public schools. The Board's motivation was legitimate, not discriminatory.

### A. A Continued Unitary School System

The court views it important that when the Board adopted the neighborhood plan, a "majority-to-minority" transfer provision was provided. This allows the parent of any elementary student attending a school where their race is in the majority to obtain a transfer to a school where their race will be in the minority. This transfer option is encouraged through district-provided, cost-free transportation; and is being exercised by parents in the district. In school year 1985–86, a total of 332 parents exercised the option, the following year, a total of 181 exercised it. (Def.Ex.108). This type of "majority-to-minority transfer option is recognized by the Supreme Court as an appropriate desegregation tool. *Swann,* 402 U.S. at 26–27, 91 S.Ct. at 1281. In a word, parents in Oklahoma City today have a choice. No pupil of a racial minority is excluded from any school in Oklahoma City on account of race. Thus, the original objective of this case, once achieved, continues to be met today.

It must also be remembered that the neighborhood school system is in wide use throughout the United States and has been for many years the basis of school administration. In fact, public policy in the United States and in the state of Oklahoma favors neighborhood schools. 20 U.S.C. § 1701(a)(2); 70 O.S. § 1210.203. The recognized advantages of neighborhood schools were discussed by the Sixth Circuit Court of Appeals in *Deal v. Cincinnati Board of Education,* 369 F.2d 55, 60 (6th Cir.1966):

> [T]he neighborhood school system ... is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children reaching school, economy of costs and reducing transportation needs, ease of placement and administration through the use of neutral, easily determined standards, and better home-school communication.

The evidence shows these positive aspects of neighborhood schools apply to Oklahoma City as well.

Plaintiffs assert that the neighborhood school plan recreated a dual school system that the standard is effect, not intent. The Supreme Court, however, has ruled that effect, rather than intent, is focused upon *only* in the remedial phase of the case when a court is determining whether a school board's proposed plan "is a permissible method of dismantling a dual system." *Wright v. Council of Emporia,* 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972); *Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979 ("The measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual school system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system."). This court's 1977 unitary finding signifies that the Oklahoma City Board of Education had satisfied its affirmative duty to desegregate by eliminating the dual school system. Since the Board had dismantled the dual system at the time it adopted its neighborhood plan, effect does not govern over purpose as plaintiffs suggest.

### B. Enhanced Academic Achievement Through the Effective Schools Program

Plaintiffs further contend that young black students cannot achieve academically in schools which are not racially balanced. A substantial amount of evidence and expert testimony was offered on this subject at the hearing, and the court concludes this assertion is without merit. Any suggestion that young blacks are intellectually inferior to young whites is contrary to empirical evidence. Socioeconomic status and the level of parental involvement, rather than the degree of racial balance, are the primary factors which impact academic achievement. (Tr. 848–49, 913–16, 1067–68, 1078, 1454, 1468). For example, Willard

Elementary School in Oklahoma City is only 6.6% black, yet its students come from families with the lowest socioeconomic status in the school district. In 1985–86, Willard's overall achievement test scores were the lowest in the district. The overall level of academic achievement at each school which is 90% or more black exceeded that at Willard. (Def. Ex. 182; Tr. 927–28). Furthermore, the evidence shows that socioeconomic factors may be overcome with sound educational programs similar to the defendant Board's "Effective Schools" program. The increased level of parental involvement which came with neighborhood schools, coupled with the Board's "Effective Schools" curriculum, resulted in overall academic gains at 8 of the 10 predominantly black elementary schools exceeding the average gains made by black children nationally. (Def. Ex. 185; Tr. 933–934). More impressive, between 1985–86 and 1986–87 the gap between third grade black and white student achievement test scores was reduced by 13%. (Def. Ex. 185, p. 4) Indeed, the testimony of nationally recognized scholars shows that the Oklahoma City School District is well on its way to becoming a nationally recognized model urban school district. (Tr. 918).

Evidence of successful effective school programs is not limited to Oklahoma City. In Chicago, for example, the high school dropout rate is 65%. However, six all-black schools implementing the effective schools concept send 80–90% of all their students to college. (Tr. 1456–58). Thus, the court concludes that the racial composition of a school has absolutely no effect on the academic achievement of its students. The Oklahoma City School Board believes that all students can learn, and the evidence supports this belief. The court also notes that blacks are not being denied an integrated educational experience, for in grades 5–12 racial balance is maintained via busing.[6]

## C. Summary

It is clear from the evidence that the current Oklahoma City School Board, more so than any this court has read about in reported case law, is conscientiously oriented to its duty to operate a unitary school system. The record shows that the Board is equally committed to providing quality education and achieving academic excellence. For the plaintiffs to claim that the K–4 Plan is a step toward a dual school system is ludicrous and absurd. These words are harsh, but true. In actuality, the Board's actions, along with the testimony of Board members, point toward a future in which the Oklahoma City School System will be nationally revered for its successful efforts to provide a superior education to each pupil regardless of the student's race.

## VI.

## SHOULD THE FOSTER PLAN BE ADOPTED?

In this phase of the litigation, plaintiffs are asking the court to implement a new

---

6. The extent of the integrated experience in grades K–12 was aptly described by Clara Luper, Youth Advisor for the NAACP since 1957 and an Oklahoma City teacher of 23 years:

p. 1420
Q. And you teach at John Marshall now?
A. Yes.
p. 1421
Q. Is the faculty at John Marshall integrated?
A. Yes.
Q. Is the staff integrated?
A. Yes.
Q. Are the facilities integrated?
A. I don't understand what you mean if the facilities are integrated.
Q. If the building itself is integrated. Student composition, the student population, is that integrated?
A. Yes.

Q. Are the extracurricular activities integrated at John Marshall?
A. We are moving toward it.
Q. Blacks and whites participate in sports and academic extracurricular activities; is that right?

A. Yes.
Q. And transportation to the school is integrated, isn't it?
A. Yes.
Q. And the same is true with the junior highs in this district;
A. Yes.
p. 1422
Q. And the middle schools?
A. Yes.
Q. And the Fifth-Year Centers?
A. Yes.

desegregation plan prepared by Dr. Gordon Foster. (Plf. Ex. 57). Dr. Foster's proposal employs techniques of pairing, clustering and busing in an effort to maintain racial balance in the school district's K–4 elementary schools. However, Dr. Foster's proposed plan affords remedial relief in addition to that provided in the Finger Plan. Under Dr. Foster's proposal, young white students in grades 1–4 would be bused for the first time in the history of Oklahoma City. Plaintiffs contend that white children should share the busing burden now because blacks carried the burden in the past. Although admirable, this concept simply does not square with principles of equity.

### A. The Foster Plan Is Not Necessary

 In light of the unitary status of the Oklahoma City School District, the plaintiffs are precluded from seeking remedial relief in addition to that afforded through the Finger Plan. As the Supreme Court noted in *Pasadena*, 427 U.S. at 436–37, 96 S.Ct. at 2705:

> [H]aving once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.

Also, the Court of Appeals recognized that, at most, plaintiffs were limited to seeking enforcement of the Finger Plan:

> [P]laintiffs also could not expect more than the approved plan provided. When, five years later, the court determined that the implementation of the Finger Plan had resulted in unitariness in the district, that finding became final, and it, too, is binding upon the parties with equal force.... We contrast this case with the *Spangler* line of cases in which an aggrieved party sought remedial relief in addition to the previous decree.

*Dowell*, 795 F.2d at 1522.

### B. The Foster Plan Is Not Feasible

 Even if the court would have concluded that continued remedial relief in Oklahoma City was appropriate, there are additional reasons why plaintiffs' proposal is not feasible. First, if plaintiffs' proposal were implemented, it is probable that the school district would sustain a substantial wave of white flight. Although white flight cannot be used as a justification for the failure of a board of education to comply with an order to dismantle a dual school system, *United States v. Scotland Neck Board of Education*, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972); *Davis v. East Baton Rouge Parish School Board*, 721 F.2d 1425, 1438 (5th Cir.1983), the probability of white flight may be considered by a court in solving the integration equation. *Riddick v. School Board of Norfolk*, 784 F.2d 521, 540 (4th Cir.1986); *Parent Association of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 720 (2nd Cir.1979); *Stout v. Jefferson County Board of Education*, 537 F.2d 800, 802 (5th Cir.1976); *Higgins v. Board of Education of Grand Rapids*, 508 F.2d 779, 794 (6th Cir.1974). Thus, the probability of substantial white flight flowing from Dr. Foster's proposed plan would lead the court to reject it, even if this court had determined that the school district should remain under a remedial order.

 In addition to the problems already noted, plaintiffs' busing proposal is not equitable. It pairs and clusters several schools which are already racially balanced. A typical example is the proposed clustering of Gatewood (29% black), Wilson (51% black) and Hawthorne (19% black). (Tr. 1377).

Additionally, the school district's superintendent, Dr. Arthur W. Steller, pointed out that if Dr. Foster's proposal were implemented it would adversely impact the school district and its recent accomplishments, in several respects. The total cost of implementing Plan A in the first year would be $7,402,913.50. For each year after that the cost would be $1,678,958.50. (Tr. 1500). During a time when the Oklahoma City School Board is confronted with substantial budget cuts, expenditures of this nature would cut directly into and adversely impact the effective schools pro-

gram and retard the progress being made by students of all races.

### C. Summary

Dr. Foster's proposal calls for the whole-sale cross-town busing of young students in Oklahoma City. It envisions perpetual implementation. In light of the school district's unitary status, the potential harms related to busing students at this tender age must be given serious consideration. Indeed, "[i]t is becoming increasingly doubtful that massive public transportation really accomplishes the desirable objectives sought." *Columbus,* 443 U.S. at 469, 99 S.Ct. at 2952 (Berger, C.J., concurring in judgment). In conclusion, Dr. Foster's busing proposal would not be acceptable to this court even if the court viewed it appropriate to retain further jurisdiction over the school district. The Foster Plan should not be adopted.

### VII.

### CONCLUSION

The Oklahoma City School District was declared unitary ten years ago, and it remains unitary today. After more than 25 years of litigation, it is time to return total control over the schools in Oklahoma City to its Board of Education. This court's regulatory control must not extend beyond the time required to remedy the effects of past intentional discrimination. *Milliken II,* 433 U.S. at 280–82, 97 S.Ct. at 2757–58. Today there are no vestiges of the past intentional discrimination which occurred in Oklahoma City; there are no indications that de jure segregation will again rear its ugly head in this community; and the purpose of this case has been fully achieved. The School Board's K–4 neighborhood school plan is constitutionally and educationally sound. Thus, its continued implementation will not be disturbed. The 1972 desegregation decree should be dissolved (along with any other injunctions issued before or during the Finger Plan's operation), and the court's remedial jurisdiction should be totally relinquished.

Based upon the foregoing findings of fact and conclusions of law, an appropriate

Order, Judgment and Decree will be issued without unnecessary delay.